E. LEE DORSETT, (PLAINTIFF), APPELLANT, v. LUCILLE McD. DORSETT, (DEFENDANT), RESPONDENT.—90 S. W. (2d) 188.

St. Louis Court of Appeals.   Opinion filed February 4, 1936.

*Watts & Gentry* for appellant.

*Jacob M.* and *Arthur V. Lashly* for respondent.

HOSTETTER, P. J.—This suit was instituted in the circuit court of the city of St. Louis on the 18th day of January, 1932, by the filing of a petition, which, caption and signatures omitted, is as follows:

## "PETITION.

"Plaintiff states that he and the defendant were formerly husband and wife, having been married about the year 1914, and that the married relation between them continued to exist until they were divorced on or about the 21st day of September, 1928, by decree of the Circuit Court of the City of St. Louis, Missouri, duly entered on said last-mentioned date, in a certain suit brought in said court by the said Lucile McD. Dorsett against this plaintiff for the purpose of obtaining a divorce from him.

"Plaintiff further states that while the relation of husband and wife still existed between him and the defendant, a certain contract in writing was duly entered into between them, duly executed by both plaintiff and defendant on or about the 19th day of September, 1928, which contract was and is as follows:

" 'This agreement executed as of the 1st day of June, 1928, by and between Lucile McDonald Dorsett, of the City of St. Louis, Missouri, first party, E. Lee Dorsett, of the City of St. Louis, Missouri, second party, and Fletcher R. Harris, third party, witnesseth; That,

" 'Whereas, first and second parties are husband and wife and reside in the City of St. Louis, Missouri, and

" 'Whereas, disagreements have arisen between first and second parties as husband and wife, and

" 'Whereas, said first and second parties desire to agree upon and make full and complete settlement and adjustment of the financial affairs and property rights of first and second parties, to provide for the future support and maintenance of first party, for the division of the joint property of first and second parties between said parties, and for the full and complete settlement and adjustment of all claims of first party against second party, for maintenance and support, as well as all dower and other rights or claims of first party to or against the property now owned or which may be hereafter acquired by second party, and in case of divorce or legal separation, for ali-

mony *pendente lite,* suit money and attorneys' fees, and alimony in gross; and,

" 'Whereas said third party has, at the request of first and second parties hereto, agreed to act as trustee for the purposes hereinafter set out;

" 'Now, therefore, for and in consideration of the mutual covenants and agreements herein, it is hereby agreed by and between said parties as follows:

" 'First. The undersigned third party herein, or his successor in office shall, for the purpose of this agreement, be and he is hereby constituted trustee of first and second parties for the purpose and with the powers and duties hereinafter more fully set forth.

" 'Second. First and second parties hereby agree that, immediately upon the execution of this instrument and contemporaneously therewith, they will execute, acknowledge and deliver to third party a warranty deed conveying the real estate situated in the City of St. Louis, Missouri, and improved with premises known and numbered as 5093 Washington Boulevard, and third party shall and will thereupon and thereafter use his best efforts to sell the same for the best price obtainable, subject to certain deed of trust now outstanding against said property and recorded at page 494, Book 3652, in the office of the Recorder of Deeds in the City of St. Louis, Missouri. Pending the sale of said real estate, second party assumes and agrees to pay the interest and other payments and perform the covenants which first and second parties are required to perform under the terms of said deed of trust; and pending said sale second party further agrees to pay the taxes, general and special, due or to become due on said real estate, and to assign and deliver to the holder of said deed of trust or to third party herein all fire and tornado insurance policies now in force upon the improvements upon said real estate, and that said policies shall be properly endorsed so as to protect the interests of the holder of said deed of trust and of the parties to this agreement, and that second party shall continue to keep said policies or an equal amount of insurance in force upon said property pending the sale thereof. In the event of the failure of second party to make the payments herein agreed to be made as and when the same shall be due, then second party shall, on demand made by the first party, pay to first party as and for her maintenance and support the sum required by this paragraph to be paid to third party, such payments to be in addition to the support and maintenance as provided in article fifth hereinafter set out.

" 'It is further understood and agreed that until said property shall be sold, first party shall have the right to occupy same without the payment of rent or other charges, provided such sale shall have been consummated on or before the 1st day of January, 1929. If on

said last-named date said real estate shall not have been sold and no earnest money contract for the sale thereof shall have been entered into between third party and a *bona fide* prospective purchaser thereof, then first party shall, upon request of second party, vacate said premises; and third party shall lease said premises for the best price obtainable, and such rental as may be by third party received therefrom shall be by him used and applied toward the payment of the mortgage interest, taxes and insurance hereinabove referred to; and after deducting for his services the usual and customary commission for leasing said property and collecting the rents therefrom, the balance, if any, then remains, shall be by said trustee paid over to first party as payment on account of the monthly payments referred to in article fifth hereof.

" 'Third. When the above-mentioned real estate shall have been sold by third party, third party shall pay the costs of such sale, including all expenses for advertising said property which he may have theretofore advanced, together with an amount to compensate him for his services as trustee hereunder, equal to the usual and customary commission of real estate agents for the sale of real estate in the City of St. Louis, Missouri, and based on the selling price of said property. From the balance thus remaining third party shall reimburse second party for any and all sums advanced and paid out by second party subsequent to June 1, 1928, for mortgage interest, taxes, insurance, repairs or other disbursements for the benefit of said real estate. The net balance then remaining in the hands of third party shall be by him paid over to first party, one-half of such net balance representing the undivided one-half interest of first party in and to said real estate and the other half of said net balance representing payments in advance by second party to first party on account of the monthly payments referred to in paragraph five hereinafter mentioned, and first party shall at the time of receiving such advance payment execute and deliver to third party to be by him delivered to second party first party's receipt acknowledging payment from second party of such amount as payments in advance on said monthly payments referred to in said paragraph five. It is further understood and agreed, however, that if first party shall die or remarry prior to the sale of said house that said one-half of the net proceeds thereof which would have been paid over to first party as advance payments under paragraph five shall belong to and be paid over to second party.

" 'Fourth. It is further understood and agreed that upon the execution of this instrument second party shall be and is hereby agreed to be the sole and exclusive owner of the personal property specified in the list hereto attached, marked ''Schedule A'' and made part of this agreement, it being understood and agreed that first party shall, within ten (10) days after the execution hereof, cause

the articles in Schedule A to be packed and delivered to second party or his representative at 5093 Washington boulevard, St. Louis, Missouri, and second party agrees to pay the expense of packing and delivery thereof.

" 'Fifth. It is further agreed that second party shall pay to first party monthly, during the lifetime of second party and until the death or remarriage of first party, for the maintenance and support of first party, the sum of two hundred fifty ($250.00) dollars, said sums to be paid on the first of each and every month, commencing June 1, 1928.

" 'Sixth. It is expressly understood and agreed that the execution of the deed to said premises by second party, together with the execution by second party of this instrument, is intended to be and is accepted and received by first party as full and complete settlement and adjustment of all dower and other property rights of first party to or against the property, real, personal or mixed, now owned or hereafter acquired by second party, and of all claims for support or otherwise which first party may now or may hereafter have arising and growing out of the marital relationship of first and second parties, and as full and complete settlement and adjustment of all claims of first party against second party for alimony *pendente lite*, suit money and attorney's fees and alimony in gross, arising out of or connected with any divorce suit which may be hereafter filed by either first or second party or suit for separate maintenance filed by first party; and in case any such suit is hereafter filed this settlement agreement may be used in such proceedings as and for, and in the nature of a stipulation of final settlement agreed upon between the parties hereto, and in full and complete discharge of any and all claims by first party against second party and in lieu of suit money, alimony, attorneys' fees, support and maintenance or other claims whatsoever; and that first party shall and will make no claim (in any petition which she may hereafter file against second party for a divorce or separate maintenance) for alimony *pendente lite*, permanent alimony, alimony in gross, attorneys' fees, suit money or support and maintenance, and that no judgment therefor shall be entered against second party.

" 'In witness whereof, the parties hereto have executed this instrument in triplicate as of the day and year first above written.

"Lucile McD. Dorsett,
"First Party.
"E. Lee Dorsett,
"Second Party.

" 'I accept the trust hereby created.

"Fletcher R. Harris.' "

"(Acknowledged by both first and second parties on September 19, 1928.)

"Plaintiff further states that said Lucile McD. Dorsett did not in her suit against him ask for any award of alimony, nor was any award thereof made by the Circuit Court in its decree in said cause.

"Plaintiff further states that following the execution of said contract he paid to the defendant the sum of $250.00 a month, as provided in said contract, as long as he was financially able to do so.

"Plaintiff further states that at the time when said contract was entered into he had a prosperous practice as a physician and surgeon and was deriving therefrom a large income and was thereby led to believe, and did believe, that he would be able to carry out the provision of said contract requiring him to pay $250.00 a month to the defendant as long as both plaintiff and defendant continued to live and the defendant remained unmarried, and that such payment would not be unreasonably burdensome to him. But plaintiff says that his financial condition has wholly changed since the time when said contract was executed; that his income from his practice has very greatly decreased, and continues to decrease; that after the granting of the divorce to the defendant, the plaintiff, still believing that his income would continue to be ample to enable him to support a family, and continue making such payments remarried, and a child has been born to him of his second marriage, and he now has his own family to support; and because of the great decrease in his income, not only has the making of the payments provided for in said contract become an unreasonable burden upon him, but it has become impossible for him to carry out said provision of said contract.

"Plaintiff further states that by reason of his changed financial condition, brought about by the decrease in his income, said contract is now wholly inequitable and unfair in its terms in that it requires the continual making of the monthly payments provided for in said contract, as aforesaid, in spite of plaintiff's inability to make such payments.

"Plaintiff further states that since it became impossible for him to continue the making of the payments provided for by the terms of said contract, the defendant has brought two separate suits against him to collect installments due under said contract; that she has obtained a judgment in each of said cases against him, has caused execution to be issued, has caused his automobile to be levied upon and taken away from him by the constable under an execution, and is threatening to continue to bring further suits against him as installments fall due under said contract and to institute garnishments, and all of said actions on the part of the plaintiff are bringing about further decrease in the plaintiff's income and loss of practice among his patients and will continue to do so as long as the defendant con-

tinues to insist upon bringing suits and obtaining judgments against the plaintiff and seeking to enforce payment of the same.

"Plaintiff further states that as long as he and defendant both live and defendant remains single, plaintiff has, and can have, no adequate remedy at law to prevent defendant from obtaining judgments against him, unless said contract is modified, and he has no remedy at law whereby he can procure any modification or reformation of said contract.

"Wherefore, by reason of the unfairness and the inequitable nature of said contract, as aforesaid, and the impossibility of performance thereof by plaintiff, the plaintiff prays the Court to set this case down for trial and to hear evidence concerning the matters and things herein alleged and to reform or modify said contract so as to remove therefrom the unreasonable burden thereby placed upon this plaintiff, as aforesaid, and upon the hearing of this cause, by its writ of injunction to forever enjoin the plaintiff from further attempting to enforce payment of any of the judgments heretofore rendered or to be rendered against this plaintiff, as aforesaid, and to enjoin the plaintiff from the further institution of any suit or suits to obtain judgments against this plaintiff on account of the monthly payments provided for in said contract, as aforesaid.

"And the plaintiff prays for all further orders, decrees and relief which seem to the Court proper, meet and just in this cause."

(Petition verified by affidavit of plaintiff.)

The defendant filed a demurrer, setting out that the petition does not state facts sufficient to constitute a cause of action and, that under the facts alleged it affirmatively appears that plaintiff is not entitled to any of the relief prayed for in said petition.

The trial court sustained defendant's said demurrer and the plaintiff declined to plead further, and, thereupon, final judgment was rendered in favor of defendant and the petition was dismissed, from which action of the trial court the plaintiff duly perfected his appeal to this Court.

An analysis of the petition, and of the contract set out therein and sought to be modified and nullified insofar as defendant is concerned, shows the following salient facts:

It appears affirmatively that the defendant has complied with all the terms and conditions imposed upon her by the terms of the written contract. It further appears that at the time the contract was entered into, the terms were fair and reasonable and that there was no fraud or undue advantage taken of the plaintiff by defendant to induce him to enter into the contract. It further appears that none of the conditions which plaintiff urges as a ground on which he bases his claim that it is now an unjust and inequitable contract was brought about by the act of the defendant, except, possibly, defend-

ant's acts in trying to make plaintiff live up to his contract by suing him on the past due installments. It further appears that plaintiff has voluntarily, and of his own accord, contributed to making it more difficult for him to pay the monthly installments by remarrying and voluntarily assuming an additional obligation of taking care of and supporting the wife and a child born of such remarriage, and that the sole ground on which he seeks to annul the contract and prevent defendant from enforcing any of its provisions against him is on account of the alleged decrease in his earnings and his taking on of said additional obligations.

We are of the opinion that the trial court correctly ruled on the demurrer. We know no reason why a contract entered into between a husband and wife without any fraud, fair, just and reasonable at the time it was entered into, should be set aside simply because of hardships in its performance, which have arisen since the contract was executed, particularly, where it has not arisen because of any fault of the other party to the contract.

The time was in Missouri when the married woman was enveloped by all the common law restrictions, disabilities and obscurations incident to coverture "when knights were bold and barons held their sway." Her act in marrying vested in the husband the title to all the personal property then owned by her or thereafter acquired by her, of which the husband obtained possession and, in general, it was held that her possession was the husband's possession. [Botts v. Gooch, 97 Mo. 88, loc. cit. 90; White y. Chaney, 20 Mo. App. 389; McClain v. Abshire, 72 Mo. App. 390; Woodford v. Stephens, 51 Mo. 443; Kidwell v. Kirkpatrick, 70 Mo. 214; Meyer v. McCabe, 73 Mo. 236.]

It was also held that according to the prevailing doctrine of courts of equity that she had a separate existence from her husband, and, having such separate existence, she might have possession and ownership of property separate from her husband, which, however, could only be dealt with by courts of equity. She could not sue or be sued in courts of law, but only equity could deal with her in respect to her separate property. She was forbidden to make contracts and could only sue or be sued in connection with her husband.

The first great landmark in the relaxation of these restrictions, disabilities and obscurations was the enactment of a statute, which appeared in Laws of Missouri 1875, page 61, and is now section 3003, Revised Statutes Missouri 1929 (Mo. Stat. Ann., sec. 3003, p. 5064), which, *inter alia*, gave her the right to sue in her own name for her personal property and rights in action. The amendment added to this law in 1889, being section 6864, Revised Statutes Missouri 1889, now section 2998, Revised Statutes Missouri 1929 (Mo. Stat. Ann., sec. 2998, p. 5055), extended her rights to a marked degree and

under such amendment she was deemed to be a *femme sole* and enabled to carry on and transact business on her own account, to contract and be contracted with, to sue and be sued at law, or in equity, and, with, or without, her husband being joined as a party with her.

Even under this amendment our courts were somewhat slow in the construction of said statutes so as to recognize her right to sue her husband on a contract in a law court, or, to permit the husband to sue her at law on her contract. As late as 1902 some courts were denying the right of either spouse to sue the other at law. The wife was prohibited from suing her husband on a contract because of the ancient disabilities of the common law, and, the husband was not permitted to sue the wife on a contract because of the legal fiction that they constituted one person, and, according to some authorities, the husband was, according to all intents and purposes, that one person.

The Kansas City Court of Appeals in two cases, after the enactment of the amendment of 1889, to-wit: Lindsay v. Archibald, 65 Mo. App. 117, and McCorkie v. Goldsmith, 60 Mo. App. 475, denied the right of either spouse to sue the other at law. However, the St. Louis Court of Appeals in Grimes v. Reynolds, 94 Mo. App. 576, decided in 1902, held that a surviving husband, who held notes against the deceased wife, could have them allowed against her estate, and, finding that its conclusions were in conflict with the rulings of the Kansas City Court of Appeals, the case was certified to the Supreme Court, and, the Supreme Court found in its opinion, Grimes v. Reynolds, 184 Mo. 679, that the St. Louis Court of Appeals announced the correct rule and adopted that court's opinion as a whole.

In the course of its opinion in that case, the Supreme Court held that "a proper construction of our married woman's acts, *supra,* leads to the complete emancipation of the wife from her matrimonial bonds, so far as her property rights are concerned, in law as well as in equity, and that she may contract with her husband, sue and be sued by him at law," and summed up the matter as follows:

"After a careful consideration we are of the opinion that the intention of our Legislature was to remove the disabilities under which a married woman labored at common law, so as to permit her to contract and be contracted with, sue and be sued, and that the language used, being entirely without exception, is broad enough to permit her to contract with her husband, and that her contracts with him will be enforced at law, just as if she had contracted with third persons, and this, we think, is the weight of judicial opinion in other States where statutes no broader than ours have been construed."

So far reaching was the amendment to the married woman's acts,

which was made in 1889, that in the later case of In re McMenamy's Guardianship, 307 Mo. 98, 270 S. W. 662 (1925), our Supreme Court commented on its effect on the written assent clause in section 3003, Revised Statutes Missouri 1929, which is the successor section to the 1875 married woman's act found in Laws of Missouri 1875, p. 61.

In section 3003, Revised Statutes Missouri 1929 (Mo. Stat. Ann., sec. 3003, p. 5064), it is provided that before the husband should have the right to dispose of his wife's personal property for his own use and benefit, her assent in writing was necessary to enable him so to do. And the Supreme Court in the McMenamy's Guardianship case, *supra*, held that the passage of the amendment of 1889 had the effect of wiping out said written assent provision and the wife could deal with her husband in respect to her personal property as she could with a third person and that she now has the power to make a valid oral gift to her husband.

It follows, according to our view, that the plaintiff in this case would have no greater right to obtain a perpetual moratorium on his obligations assumed in the contract to his wife than he would have in any contract which he might make with a third person.

It is suggested, on behalf of the plaintiff, that the wife may not barter away her prospective rights in her husband's estate, but, it further appears 'that she turned over certain properties, real and personal, in which she had and owned an interest. She paid the price. No complaint is made that she did not carry out in full measure all the obligations placed upon her in and by the terms of the written contract. No charge is made that she did anything to make the contract unjust, onerous and unreasonable or to render him powerless to comply with its provisions, unless we take the charge that, by her efforts to collect what was coming to her under the terms of the contract she had, to that extent, injured his business so as to decrease his earnings. However, as he first breached the contract by failing to pay the stipulated sums, we do not feel that her efforts to collect are usable on his part to now say that she has had a hand in rendering the contract more onerous, and, therefore, more difficult for him to comply with. But it also affirmatively appears that he has voluntarily lessened his ability to comply with the terms of his contract with the defendant by taking on duties to support another family, which, of course, creates added expense. While that, in and of itself, is not something for which he should be criticized, or condemned, because, it is, of course, perfectly proper for him to remarry and rear a family, and, in general, that may be regarded as a very commendable act and evinces a wholesome disposition to do his part in combating race , suicide, which was so much talked of and feared by our first great president named Roose-

velt; but, when he takes on these new burdens and seeks to use them as an excuse for defaulting on his *bona fide* existing contracts and having them annulled, we are unable to give our approval.

In the parable of the great supper, Luke 14:16-24, a "certain man" prepared a feast and invited in the elite to partake of it, "and they all with one consent began to make excuses." One had bought a piece of ground and wished to examine it; another had bought five yoke of oxen and wished to prove them; another said: "I have married a wife, and therefore, I cannot come." And the Lord said to his servant: "Go out into the highways and hedges and compel them to come. . . . None of these men which were bidden shall taste of my supper." Likewise, we are unable to accept the excuse of plaintiff having "married a wife," as a valid one for seeking a modification, which amounts to an annulment, of his contract with his former wife. That the parties had in mind, when they made the contract, the possibility of a remarriage of one or both of the contracting parties is evidenced by the fact that it was stipulated therein that the remarriage of the wife would terminate the husband's obligation to pay.

In Willard v. Taylor, 77 U. S. Reports, L. Ed. 501, loc. cit. 505, in discussing a contract to sell real estate, made by a lessor to a lessee, wherein the latter had the right to buy on certain agreed terms and within the time of his lease, and the property had materially advanced in value and it was sought to enforce specific performance, the Court said: "The question in such cases, always is, was the contract, at the time it was made, a reasonable and fair one. If such were the fact the parties are considered as having taken upon themselves the risk of subsequent fluctuations in the value of the property and such fluctuations are not allowed to prevent its specific performance."

In Baumohl v. Goldstein, 95 N. J. Eq. 597, loc. cit. 602, the Court said:

"In this court, where the intent of the parties is the thing sought to be enforced, every effort should be made to hold men to agreements into which they have voluntarily entered, where the same are not obnoxious to any law or policy, and upon the strength of which others have changed their position or circumstances, or parted with a valuable consideration."

In Coffin v. Younker (Iowa Supreme), 195 N. W. 591, loc. cit. 593, the court said: "Equity does not interfere to prevent enforcement of the express terms of a legal contract, even though by virtue of circumstances such enforcement may work a hardship upon one of the contracting parties."

Under the law of Missouri, as it exists at present, both husband and wife being *sui juris* may make a valid and binding agreement

to a property settlement in contemplation of a divorce without submitting the same to the court which may thereafter hear and determine all questions in respect to the divorce. This was done in the instant case. No alimony or allowances at all were asked by the wife in her suit for divorce. Therefore, the circuit court, which treats divorce cases as if cases in equity, never had jurisdiction over the question of allowances or alimony. Equity jurisdiction will extend "only to controversies which arise and are submitted by proper proceedings between parties." [21 Corpus Juris, p. 137, sec. 117.]

We have carefully examined the authorities cited on behalf of the plaintiff and fail to find that they, when properly analyzed, affect the soundness of the conclusion which we have reached in this case. We feel that the cases hereinbefore referred to, together with the following cases, furnish ample support for the ruling in the instant case. [Stoddard v. Stoddard, 227 N. Y. 13, 124 N. E. 91 (1919; Ct. of App. of N. Y.); Adams v. Adams, 32 Pa. Superior Ct., 353 (1906); Vandegrift v. Vandegrift, 63 N. J. Eq. 124, 51 Atl. 200 (Ct. of Chancery of N. J., 1901); Gilsey v. Gilsey, 195 Mo. App. 407, 193 S. W. 858 (1917, K. C.); Rough v. Rough, 195 S. W. 501 (1917, Mo. App. Springfield); Banner v. Banner, 184 Mo. App. 396, 171 S. W. 2 (1914, K. C.).]

It follows that the judgment of the trial court should be affirmed, and, it is so ordered. *Becker* and *McCullen, JJ.*, concur.