**RICHARDS et al. v. COMBEST et al.**

No. 4439.

Court of Civil Appeals of Texas.
Beaumont.

Sept. 25, 1947.

Rehearing Denied Feb. 11, 1948.

O'Fiel & O'Fiel, of Beaumont, for appellants.

W. O. Bowers, of Beaumont, for appellees.

WALKER, Justice.

This action involves conflicting claims of title to Lots 9 and 10, Block 14, of the Ogden Addition to the City of Beaumont, in Jefferson County.

Appellants, excepting formal parties, are five of the children of F. W. Richards, Sr., and wife, Bertha Wellman Richards. The sixth of said children, plaintiffs' brother, F. W. Richards, Jr., is not a party to this action. Appellees are Ross Combest and John D. Howard, to whom Mr. Combest had conveyed the property in suit.

Appellants, who are referred to hereinafter as plaintiffs, brought this action against appellees, referred to hereinafter as defendants, upon allegations which may be grouped in two counts for the purposes of descriptions. Their first count is in trespass to try title. Their second count, which is pleaded in the alternative, al-

leges the contract between F. W. Richards, Sr., as buyer, and Ross Combest as seller, dated September 10, 1943, which is described below in our statement of evidence. Under this contract, defendant Combest agreed to sell and convey the property to Mr. Richards upon the payment of a stipulated purchase price. Plaintiffs alleged that they had succeeded to the contract rights of Richards, Sr., by inheritance under the statutes of descent and distribution. They prayed judgment for title to and possession of the aforesaid property, for the recovery of rents and damages, and for general relief.

Defendants filed only a plea of not guilty by way of answer.

This cause was tried to a jury, but at the conclusion of the evidence the trial court instructed a verdict for defendants and subsequently rendered a judgment upon this verdict, that plaintiffs take nothing by their suit.

During the course of the trial, before the conclusion of the testimony, plaintiffs paid the sum of $8,600 into the hands of the clerk, as a tender of payment in discharge of sums owned by them under the contract between Richards, Sr., an defendant Combest.

There is evidence of the following matters:

(I) The property involved in this suit was conveyed to defendant Combest by Mrs. Cipora Jones before any of the events now to be related.

(II) On September 10, 1943, defendant Combest and F. R. Richards, Sr., entered into a written contract whereby Combest agreed to sell and convey and Richards, Sr., agreed to buy the property for $8,500. Richards, Sr., had paid $125 of this sum two days earlier; and under the contract, the balance of the price, and 5% interest thereon, was payable in monthly installments of $125 each. The first of these installments became due on October 10, 1943, and an installment became due on the 10th day of each month thereafter until the purchase price was paid. Each installment was to be credited first to the payment of interest, and the balance thereof, to the payment of principal. Defend-

ant Combest was to convey the property to Richards, Sr., when payment of the purchase price had been completed.

This contract contained the following provisions:

"Fourth: It is agreed that should the Buyer fail to pay any installment as herein described, the full amount of the purchase price shall at the option of the Seller at once become due and payable, and if not paid within thirty (30) days thereafter then all payments previously made shall be forfeited to the Seller not as a penalty but as liquidated damages for breach of this contract, and this contract shall in such event become null and void and all rights of the Buyer hereunder shall cease and terminate. In the event of such default, evidence of the cancellation of this contract shall be a notice in writing from Seller addressed to Buyer at his last known address by registered mail, and the affidavit of Seller of the mailing of such letter or notice, together with a copy of same, shall be conclusive evidence of the termination hereof.

"Fifth: It is agreed that time is the essence of this contract, but that failure or delay to exercise any option herein by Seller at the time of default shall not be or operate as a waiver of the right to exercise said option at any time thereafter.

"Sixth: It is agreed that if default is made in the payment of any installment as herein described, and this instrument is placed in the hands of an attorney for collection, or is collected through the Probate of Bankrupt Court, the Buyer will pay an additional sum of ten per cent of the amount then due as collection fees. Buyer reserves the right to pay any and all of said installments before maturity.

"Seventh: This contract of sale is made with the understanding that the deed from Seller to Buyer when executed and delivered, according to the terms hereof, shall be subject to the restrictions that said entire Ogden Addition were originally sold under.

"Eighth: It is understood that when said purchase price and all interest and deposit shall be fully paid, Seller will execute and deliver to Buyer a general war-

ranty deed conveying to the Buyer the property covered in this contract, such deed to convey said property free from all encumbrances and claims, except such as may have been incurred thereon by or through the acts of negligence of the Buyer, but subject, however, to the restrictions herein mentioned."

A photostatic copy of defendant Combest's ledger sheet on which was entered the account of Richards, Sr., under this contract is contained in the statements of facts.

(III) When this contract was made, F. R. Richards, Sr., was married to Bertha Wellman Richards, and Mr. and Mrs. Richards took possession of the property immediately after the contract became effective, and made the property their residence. F. R. Richards, Sr., resided upon this property until his death on July 25, 1944. The evidence does not show when Mrs. Richards' residence upon the property ended. She was adjudicated insane on August 22, 1944 by the County Court of Jefferson County, and was committed to the State Hospital for the Insane at Rusk, where she died on October 6, 1944.

The children of Mr. and Mrs. Richards also resided upon the property from time to time.

(IV) Both F. R. Richards, Sr., and Bertha Wellman Richards died intestate, and no administration was had upon the estate of either. The record does not show whether an administration upon these estates was or was not necessary.

(V) Mr. and Mrs. Richards had the following six children, all of whom survive them:

(a) F. W. Richards, Jr., a son, whose wife was Dorothy Fay Richards. These people resided upon the property when Richards, Sr., died, and continuously thereafter until they were dispossessed by defendant Howard after his purchase from Richards, Jr., on November 30, 1944.

(b) M. W. Richards, a son, who was serving abroad in the U. S. Army when his father died and apparently at all later times of any significance here.

(c) Frances, a daughter, who married Charles L. Kaiser. The evidence shows that she resided upon the property from about seven or eight months before her father's death until about September 1, 1944, when she went to Wisconsin to be with her husband, who was in the U. S. Service.

(d) Kathleen, a daughter, who married Donald Madray. She was residing upon the property when Howard sued for possession and some statements by her sister, Mrs. O'Brien, show that she must have been there prior to the contract between defendant Combest and her brother, F. W. Richards, Jr., which is described below. Her husband was also in the U. S. Service. According to Mrs. O'Brien, she and her sister-in-law, Mrs. F. W. Richards, Jr., accompanied a prospective purchaser of the property to Combest's office.

(f) Mary Ann, a daughter, who married Randolph Neal. Her husband was also inducted into the U. S. Service and she was residing upon the property when defendant Howard brought suit for possession. The evidence does not show when her residence upon the property began.

These children, excepting F. W. Richards, Jr., constitute, with the husbands of the four girls, the plaintiffs in this case.

(VI) F. W. Richards, Sr., paid a $125 installment under his contract during each month after September, 1943 until the month of June, 1944. The installment accruing on June 10, 1944, was not paid until July 6, 1944, and it was accordingly 26 days late. Entries upon defendant Combest's ledger sheet show that each payment made after that accruing on October 10, 1943 (the second) was also late, from two to fourteen days.

Combest never made any point of these delays in payment. He said that Richards, Sr., paid his bookkeeper, and he had no recollection of having seen Richards, Sr., after making the contract of 1943.

Each payment made by Richards, Sr., was first credited to the payment of accrued interest, as the contract of 1943 provided, and the balance remaining was then credited to the payment of the prin-

cipal indebtedness. Mr. Combest's ledger sheet shows that after crediting the payment made on July 6, 1944, the balance of the purchase price remaining unpaid was $7,622.42.

(VII) No payment after July 6, 1944 was made to defendant Combest upon the purchase price of the property until September 10, 1944, when a young lady, whom Mr. Combest thought was a member of the Richards family, paid him $125. Mr. Combest could not otherwise identify this person.

This payment of September 10, 1944 was the last made by any of the Richards family; and Mr. Combest's ledger sheet shows that this payment was credited to the discharge of accrued interest and principal exactly as earlier payments had been credited. (Separate entries were not made in the payment columns entitled "Interest" and "Princ."; but to the $7,622.42 of principal remaining unpaid on July 6, 1944 was added a sum ($93.58) for interest covering the period from July 6, to September 10, making the total sum owed on September 10, 1944 to be $7,716. The $125 paid on September 10, 1944 was then deducted from this $7,716, leaving a balance owing amounting to $7,591.)

(VIII) On September 10, 1944, a year after the date of the contract between defendant Combest and Richards, Sr., Combest entered into a written contract with F. W. Richards, Jr., whereby he agreed to sell and convey the property to the said Richards, Jr., for a sum which defendant Combest declared to be $200 less than the sum owed under the contract of Richards, Sr. This new contract of 1944 was not introduced in evidence, but the testimony indicates some of its terms. Richards, Jr., was to pay $125 per month on the 10th day of each month, as had been provided in his father's contract, and his contract also contained some kind of a forfeiture provision.

Defendant Combest said that the $125 paid to him on September 10, 1944, was paid under this contract with Richards, Jr. However, as we have already shown, this payment was entered upon the ledger sheet bearing the account of Richards, Sr., and was credited on this sheet to the discharge of accrued interest and unpaid principal indebtedness precisely as if it had been made under the contract of Richards, Sr. This course of conduct in defendant Combest's office seems inconsistent with Combest's testimony of a $200 discount to Richards, Jr., and with the inference to be drawn from some of his testimony that plaintiffs' rights under the contract of Richards, Sr., had been abrogated. These ledger entries were not explained, and they afford some corroboration of Mrs. O'-Brien's testimony referred to below.

Later, on November 30, 1944, F. W. Richards, Jr., and his wife made a quitclaim deed to defendant John D. Howard and wife, conveying their interest in the property; and on December 1, 1944, defendant Combest conveyed the property to Howard and wife by a general warranty deed. Mr. Combest's grantees assumed the payment of the balance owed under his note to Cipora Jones, assessed at $4,800. Still later, defendant Howard sued Richards, Jr., for possession of the property. He recovered possession and was occupying the property when the present suit was filed.

(IX) Testimony concerning the various communications and transactions between defendant Combest and members of the Richards family occurring after Richards, Sr., died and before the execution of the contract between Richards, Jr., and defendant Combest is conflicting in some respects and is ambiguous in other respects.

Defendant Combest's testimony shows that he learned in some way of the death of Richards, Sr., and that his bookkeeper (apparently, after Richards, Sr., died) informed him that the account of Richards, Sr., was delinquent. He subsequently communicated with members of the Richards family who were residing upon the property, and on various occasions, in the Richards home and in his office, he discussed with one or more members of the Richards family the payment to him of the balance owed him by Richards, Sr. How many times he saw these people, and on what dates, the evidence does not show, and of the people he talked with he could

only identify Richards, Jr. He must have engaged in several of these conferences, however, and at least one of the two young ladies he said that he had talked with was a member of the Richards family. He never saw Bertha Wellman Richards.

Defendant Combest, according to his testimony, did not attempt to hold the Richards family to the strict letter of their contract. He said that he found them in straitened circumstances after the death of Richards, Sr.; and he granted them time to make arrangements to pay him. He was willing to allow them a discount if they would assume performance of Richard Sr.'s contract, and it must be inferred that he at least acquiesced in efforts which the Richards children made to sell the property to others. (He certainly said that he attempted to help them dispose of the property after September 10, 1944.) Mr. Combest's testimony is general in terms and in some respects is confusing. No dates can be assigned to any details of his conduct between July 25, 1944, and September 10, 1944, but from the general tenor of his testimony we infer that after a period of delay he gradually exerted pressure upon the Richards children to secure payment of the debt to him.

The following quotations indicate the indulgence extended the Richards family by defendant Combest, and the motives actuating him. (1) "Q. When was it called to your attention that (Richards, Sr.) was delinquent? A. Well, the girl in the office, the bookkeeper had called my attention to the fact that he was behind; and I had heard that he had died. We didn't see anybody until 30 days afterward". (2) "Q. Then (Richards, Sr.) had no payments in August and had no payments in September? A. No, I didn't get any more payments. I called on them, and they seemed very hard up, and I was willing to wait on them". He called at the Richards home, on the property. "There were two girls there, and I talked to both of them, and one of the boys, young Richards. Q. What was done with reference to the contract at that time? A. I tried to get them to pay it, and told them I would give them some discount—". Later, the

two girls and Richards, Jr., came to his office. (3) "One time they came (he apparently referred to the two girls) and brought Rev. Greene (a prospective purchaser). That was before they had even bought the place. I told them "If you don't pay something we are going to have to take the place, and so they did; made a down payment of $125." This was the payment made in September. (4) (What did he do when he first knew that the account of Richards Sr. was delinquent?) "I wrote them a letter and asked them to come in, and I don't think they did at that time; and I went out to see them, told them the payments were not taken care of and it was explained to me that they had considerable expense and I didn't crowd them for about 60 days." The persons he talked with on this occasion were "F. W. Richards, Jr., and two girls, F. W. Richards and his wife and two girls." They (the two girls) were daughters of Richards, Sr. Witness could not name them. He saw them "out at the house. I saw them several times." He went out several times to see them at the house, to determine "when they were going to pay; when they were going to start paying on the property. I was paying the (Bank) every month and they weren't paying me." (Well, at least one of the girls was a daughter of Richards, Sr.)

Mr. Combest's testimony regarding the nature of the transaction expressed eventually in his contract with Richards, Jr., is not clear.

Some of his statements leave the impression that he thought this contract was the result of an agreement between him and the Richards family (although he never took into consideration the presumptive community interest of Bertha Wellman Richards, whom he never saw). For instance, he testified:

(1) Q. "Now, did you make some arrangement with Mr. F. W. Richards, Jr. A. I made it with the whole family excepting one party." (2) "One time they came and brought Rev. Greene. That was before they had ever bought the place. I told them 'If you don't pay something we are going to have to take the place,'

and so they did; made a down payment of $125. Q. Was that the July payment or was that the payment in September? A. That was September. Q. Was that at the same time you executed a contract with F. W. Richards, Jr.? A. I had made an agreement to execute one before that, but they had agreed to pay more money than they could pay; and they couldn't pay only $125. They said they would pay $125 down and keep them up. Q. And the amount of the contract with F. W. Richards, Jr., was something less than the balance due on F. W. Richards Sr.'s contract? A. $200 less." (3) "Q. Did they ever handle any sales through your office, any of the Richards children? A. No, sir; they came to the office and made an agreement with me that they would let this boy buy the property, and they would live in the house. They had no place to stay; they would give him money to pay me which they never did pay". (4) "Q. You said awhile ago that Mr. Richards made a payment of $125. Who made the payment? A. I think one of the girls made it for Mr. Richards. All of them agreed to the contract except one boy that was away in the Army. One of the girls had written him a letter and had his consent." (5) "That September 10th payment she brought to the office and claimed that everybody had paid some of it." (6) "Q. Did they (apparently referring to a daughter and to the daughter-in-law of Richards, Sr.) talk to you about F. W. Richards' contract of purchase? A. Yes, they said that they thought they could make it if they all paid him rent. I believe there were four families living in the house that would pay him rent, and he would be able to make the payments."

This testimony indicates an agreement between defendant Combest and the Richards children that the contract between Richards, Sr., and Combest would be annulled and a new contract formally made between Combest and Richards, Jr., and that the written contract dated September 10, 1944 between Richards, Jr., and defendant Combest only consummated this agreement.

However, Combest also gave testimony which tends to show that he rescinded his contract with Richards, Sr., by unilateral action, without reference to consent by the Richards family. For instance, he testified:

"Q. What action, Mr. Combest, did you take to determine that the F. W. Richards contract * * * or notify them of the cancellation? A. I wrote them several letters. They never did respond and I would go out to see them and talk to them, and never could get any satisfaction.

"Q. You say 'Talk to them'; we have got to get more definite. A. F. W. Richards, Jr., his wife and two of his sisters.

"Q. When was this cancellation notice put on here?" (Indicating on ledger sheet.)

(The ledger sheet to which counsel here referred is that referred to above on which were entered the various payments which Richards, Sr., had made and also, the payment of September 10, 1944. Immediately beneath the entry dated September 10, 1944 appears the entry: "Oct. & Nov. interest accrued—$63.26", and this sum was added to the principal debt remaining unpaid after the September 10, 1944 payment had been credited to the account. The balance then owed, as entered upon the ledger sheet, was $7,654.26. Beneath all of these entries there appears in two places the stamped word "Cancelled"; and at the bottom of the ledger sheet below these two words appears the statement: "July, Aug.–Oct.–Nov. & Dec. 1944 installments delinquent". One knowing that Howard had later purchased the property might infer that the word "Cancelled" represented only a notation by the bookkeeper intended to show that this account had been closed and that "Cancelled" was not stamped upon the ledger sheet until after the entry "Oct. & Nov. interest accrued" was made. Such a conclusion would deprive the word "Cancelled" of any significance since Combest testified unequivocally that his conveyance to defendant Howard was not a forfeiture, as appears below. However, Combest gave testimony exactly contrary to the inference we have drawn respecting the date when "Cancelled" was stamped upon the ledger sheet.)

Defendant Combest testified in response to

the question quoted above, referring to the word "Cancelled": "It was cancelled just before F. W. Richards, Jr., purchased the contract. The date of cancellation might be on that sheet". He testified immediately afterwards upon cross-examination by plaintiffs' counsel:

"Q. Well, you have got two cancellation marks on there. A. Yes, sir. If I hadn't cancelled them they never would have bought it. That's the way I had to get my $125. I couldn't get my money any other way, but they did pay $125 when they bought the property.

"Q. Did it require two such actions? A. Well, I cancelled it, and had the right under the agreement and they purchased the property.

"Q. That's what you claim. A. That is the best I could get—

"Q. Why are there two stamps on there? A. I don't know about that.

"Q. Who made them? A. The bookkeeper puts the stamp on it.

"Q. You didn't do it? A. No, sir. He done it at my orders.

"Q. Did you see him do it? A. No, sir."

Accepting as true defendant Combest's testimony regarding his cancellation of Richards Sr.'s contract, then this purported cancellation was evidently nothing but a part of his bargaining with the Richards children, a means whereby he exerted pressure upon them to make some arrangement to pay for the property in which they were residing. He must have declared this cancellation in his office without notice of any character to the Richards family until after the event occurred.

Mrs. Anna Eloise Richards O'Brien, a daughter of Richards, Sr., contradicted Combest's version of the facts. She thought the $125 paid on September 10, 1944 was paid under her father's contract, and she said that she knew nothing about Combest's contract with her brother until defendant Howard sued for possession of the property. She, at least, according to her testimony never agreed to any rescission of her father's contract and never knew, until Howard brought his suit for possession that any one else thought that the contract had expired.

Mrs. O'Brien testified:

(1) "Q. Do you know whether or not any member of the family paid any installments on the purchase price of this contract on behalf of your father after he died? A. My sister did.

"Q. Do you know what amount she paid? A. She paid $125 once, that I really know of.

"Q. Do you remember the date? A. It was the September payment, because I was living at Richmond, Michigan, and came home on August the 23rd, and she paid the September payment.

"Q. Do you know anything about the payment in July, 1944—I mean the August 1944, note? A. I really couldn't say; I wasn't at home at the time."

(2) "Q. Do you know Mr. John D. Howard? A. I met him when he came to the house, to look at the house.

"Q. Do you know about what time that was, Mrs. O'Brien? A. Well, it was either in the last of—it was in the last of October, I believe, when he first started coming to the house.

"Q. At that time did you or not have some discussion with him about making a deal to buy from the children of your father and mother this property? A. Mr. Howard come out to look the property over; it was advertised in the paper.

"Q. By whom? A. By my brother and sister. We put an ad in the paper, and he came to look at the house. He came several times, and Mr. Howard was going to buy the house for the equity, and for some reason or other Mr. Combest came out and told us the deal had fallen through. So we re-advertised the house, and then, about two or three weeks, around three weeks, Mr. Howard come back out and contacted my brother and offered him $250 for the equity, without any knowledge of my sister or I, and we didn't even know the house was sold until we got notice to get out.

"Q. In the original deal, you say that Mr. Combest interfered with, or said it didn't go through, what was Mr. Howard going to pay? A. We asked $1,600 for our equity. That's what we were asking.

"Q. Had he or not agreed to pay it? A. He had agreed to buy the equity, and Mr. Combest came out and said the deal had fallen through.

"Q. That was Mr. John D. Howard and Mr. Combest that are here. A. Yes, sir."

(3) "Q. This equity you speak of, that was the money your father had paid in on the property? A. Yes, sir; that was what he had paid in."

(4) "Q. Were you familiar with the fact that your brother, F. W. Richards, Jr., was trying to make a contract with Ross Combest to take over the property and pay for it according to the same terms that your father had? A. No, sir, I didn't know that he was trying to make a contract with him.

"Q. You never did see that contract? A. No, sir."

She then gave testimony showing that her brother was living upon the premises at the time in question and had been since their father purchased the property. Her brother had rented a room from her father. Two of her sisters were also residing upon the property at the time in question.

(5) "Q. Do you know, Mrs. O'Brien, which one of your sisters brought your brother's contract to Mr. Combest, signed by him? A. I don't think it was a sister. I think it was Mr. Richard's wife. I wouldn't say for sure.

"Q. You knew about that fact? You knew that F. W. Richards, Jr., had signed it out there at the house? A. After it all came up, when I got a court order to get out, yes, sir.

"Q. I am talking about in September, 1944. A. I didn't know that F. W. Jr. had made a contract with Mr. Combest."

Still later she testified:

"Q. Mrs. O'Brien, were you at home when there were received letters from Mr. Combest after September, 1944, asking for possession of the premises? A. I was at home—I came home in August, but I don't know of any letters wanting possession of the property. The first I knew of it was when I got a court order, to be summoned in Court.

"Q. You didn't know that Mr. Combest's daughter had come out there and delivered a letter in person? A. No, sir.

"Q. That was in November, 1944; were you living there then? A. I was living there, yes, sir."

(X) The only cancellation or forfeiture attempted by defendant Combest was that referred to above, an incident of his dealings with the Richards children prior to September 10, 1944. He testified unequivocally that his conveyance to defendant Howard was not a forfeiture of his contract with Richards, Jr., but was made in recognition of, and pursuant to that contract and was not made until Richards, Jr., had given defendant Howard the quitclaim deed referred to above.

Defendant Combest said, for example:

(1) "Q. Did you afterwards sell the property to Mr. Howard? A. Only upon presentation of the deed from Mr. Richards to him.

"Q. Mr. F. W. Richards, Jr.? A. Yes, sir.

"Q. What, if anything, did Mr. Howard pay? A. He paid slightly less than Mr. Richards. I gave him a small discount. It was immaterial. But he was supposed to pay just what Mr. Richards did—

"Q. You accepted from Mr. Howard the balance due on the purchase price that was originally made by F. W. Richards, Sr. did you? A. Yes, sir."

(2) "I tried to get them to sell the place, because I knew that they should sell it for more money than I sold it to them; and I wrote one or two ads, and told them if they would advertise the place and get their money out of it, so I could get mine also. I believe Mr. Howard is the cause of my calling on them, because he had seen the property in the paper.

"Q. Did you know Howard at that time? A. Well, about that time. After he had gone and seen it, he talked to me about it."

(3) "When Mr. Howard went out and bought the place from them, and brought his transfer in to me, and said he had bought the place."

His testimony then shows that upon Howard presenting to him the quitclaim

deed from Richards, Jr., and wife to Howard and wife, referred to above, he made his conveyance to Howard and wife.

(4) "Q. Now, when Mr. Howard came to you, then, he had a talk with you before he brought you the deed from young Richards, did he? A. Yes, sir.

"Q. And you explained to him the whole transaction? A. Yes, sir. I told him to buy it off of Mr. Richards; he could buy it off him cheaper than he could me.

"Q. Did you explain to him the whole transaction whereby F. W. Richards, Sr., had gone into the purchase, and did you tell him about F. W. Richards, Jr., attempting to pick up the contract in September? A. I don't know as I did; but he talked with Mr. Richards several times. He was familiar with whatever transaction was on."

(5) "Q. Then on December 10, 1944, or on the 30th of November, 1944, young Richards didn't have any equity there, because you had elected to rescind the contract with him? A. No, I hadn't cancelled the contract; I had been trying—he is the fellow who sold the property. I didn't sell it.

"Q. You delivered the deed? A. I delivered title, because title was in me."

(6) "Q. When you dealt with Howard, you dealt with the transaction just like you were dealing with F. W. Richards, Sr.? A. I dealt with him like I was dealing with Richards, Jr."

(7) "Q. Will you attempt to swear that you made a cancellation on F. W. Richards, and then one after this man bought? A. No; I didn't make the cancellation after he bought. I was getting ready to make one."

(XI) If Mrs. O'Brien's version of the facts respecting cancellation of her father's contract be accepted, then her testimony (supported by various items referred to or quoted above) raises the issue that defendant Howard knew of her claim and that of the balance of the Richards children to an interest under the contract of Richards, Sr., and further, that he at one time agreed to buy the interest claimed by the plaintiffs. Defendant Howard did not deny this (nor did defendant Combest refer to this matter) and he never said what he knew or did not know about the various transactions between the Richards family and defendant Combest. There was evidence from both him and defendant Combest that he discussed the purchase of the property with Combest and with Richards, Jr., but he denied that he had discussed purchasing the property with any other member of the Richards family. The evidence does not show what was said during his discussions with Richards, Jr. Howard did say that he had talked with other persons residing in the property.

## Opinion

Plaintiffs have assigned five Points of Error for reversal. We shall discuss only point 3 which reads: "The trial court erred in instructing a verdict for appellees, for that appellants, children and heirs of F. W. Richards and wife, having made demand and thereafter seasonably brought suit, and in open court made tender of amount due under the said contract of sale between F. W. Richards, Sr. and appellee, Combest, and in law such said contract being valid and subsisting, appellants were entitled to specific performance of said contract as against appellees."

Concerning the arguments made under Point 3, we need only say that we disagree with plaintiffs. However, we sustain Point 3, to the extent shown at the foot of this opinion, upon the following grounds:

■ (A) The forfeiture clause in the contract between Richards, Sr., as buyer and defendant Combest as seller, has been quoted above in Article II of our conclusions of fact. This clause did not authorize Combest to declare a forfeiture of the contract if Richards, Sr., delayed the payment of an installment. In fact, it did not authorize Combest to declare any forfeiture until after the forfeiture had already occurred; it did provide for notice in that event. All that this clause authorized Combest to do was to declare an acceleration of unpaid installments of the purchase price (upon Richards Sr.'s failure to pay an installment when due), and if the sum thus becoming due was not paid by Richards, Sr., within 30 days, the con-

tract terminated. The forfeiture was an automatic incident of Richards Sr.'s failure to pay the balance of the purchase price after payment of that sum had been accelerated by Combest. Defendant Combest's acceleration of payment was thus a condition precedent to any forfeiture under this provision of the contract.

There is some indication in the record that defendant Combest interpreted the forfeiture clause differently and that he thought he had the power to forfeit the contract by his unilateral declaration to that effect after 30 days delay in paying an installment. However, this was a misconstruction of the contract.

(B) A second condition precedent to forfeiture was notice from defendant Combest to Richards, Sr., that he had elected to accelerate payment of the balance owed under the contract.

■ The contract does not provide specifically for this notice, but the necessity of such notice is implicit in the terms of the forfeiture clause. It is provided in that clause that upon the default of Richards, Sr., "the full amount of the purchase price shall at the option of the seller at once become due and payable, and if not paid within thirty (30) days thereafter, then all payments previously made shall be forfeited to the seller—and this contract—shall become null and void and all rights of the buyer hereunder shall cease and terminate". Richards, Sr., could not use the 30 days thus granted to him unless and until he knew that Combest had exercised the option to declare the debt due; and he could not discover this fact unless Combest notified him that payment had been accelerated, or unless he inquired of Combest what the latter intended. The parties can hardly have intended that Richards, Sr., after a default, should persistently address inquiries to Combest until Combest decided what he would do. Since a forfeiture was provided to secure Combest, since it resulted only at Combest's option, and since Combest's exercise of his option invoked in Richards Sr.'s favor a last 30 days delay to avoid the forfeiture, it must be implied that Combest would

notify Richards, Sr., that he had declared all indebtedness under the contract due.

This notice of acceleration must have been a condition precedent to forfeiture because Richards Sr.'s use of his 30 days for avoiding the forfeiture depended upon his receiving this notice.

■ (C) This forfeiture clause provided the only method by which defendant Combest, acting alone and upon the ground that Richards, Sr., had defaulted in payment, could destroy Richards Sr.'s right under the contract to acquire the property by paying the purchase price. The contract now under discussion differs from that evidenced in a deed reserving a vendor's lien.

■ In reaching this conclusion, we have made a distinction between a forfeiture and a rescission. The forfeiture we have in mind represents the exercise of a contractual right, by a party to the contract, with the consequences declared in the contract. The rescission we have in mind represents the exercise of a right which is vested by law and not by agreement in the owner of the title to land as an incident of that owner's executory contract for the sale of that land, and the consequences of such a rescission are to be determined from a consideration of the law. Our expression of this distinction made between forfeiture and rescission is not intended to be precise.

■ The forfeiture clause in the contract between Richards, Sr., and defendant Combest provides for a forfeiture (as distinguished from a rescission); and its expression in that contract shows that the parties intended to limit Combest to the forfeiture—as distinguished from the rescission. This is true because of these reasons: (1) A lawful forfeiture and a lawful rescission would each result in bringing to an end the contract right of Richards, Sr., to acquire the property by paying the purchase price, and to this extent would operate upon a common subject matter. (2) Yet the exercise of these two powers upon this common subject matter might have inconsistent results. The forfeiture clause differs from the power to rescind, and an exercise of the power to

rescind might deprive the buyer of his right to have the seller perform the conditions precedent to forfeiture agreed upon in the forfeiture clause, and of the 30 days granted the buyer in the forfeiture clause to pay the balance owed on the purchase price. The buyer would never expect such a result; Richards, Sr., could not have thought that Combest could terminate the contract by his unilateral action in any way other than by complying with the forfeiture clause.

These remarks, of course, apply only to the ground of action stated in the forfeiture clause, namely, the buyer's default in payment.

There is some authority for such a construction of the contract between Richards, Sr., and defendant Combest. In O'Neal v. Bush & Tillar, 108 Tex. 246, 173 S.W. 869, the Supreme Court considered a contract for the sale of land under which the purchasers had paid $10,000 of the price when the contract was executed and had agreed to pay the balance in installments. This contract provided that if the purchasers "should violate any of the terms and conditions of the contract and 'fail to perfect, consummate and carry out' same, the $10,000 paid by them should not be 'considered or become a partial payment upon the lands,' but should be 'received, held and kept' by (vendors) as liquidated damages." The Supreme Court held on original hearing: "We are of opinion that this had the effect to deprive (vendors) of the right to rescind the contract for the sale of the land. They provided their remedy by the appropriation of the $10,000 as damages for the failure of (purchasers) to perform the terms of the contract. They could not have damages for the failure to perform the terms of the contract, and at the same time destroy that contract." Judgment under this opinion was set aside by an order reported at 108 Tex. 246, 177 S.W. 953; but on rehearing, reported at 108 Tex. 246, 191 S.W. 1133, the court, without referring to the point, arrived at the same judgment, less an immaterial modification in the damages due.

■ Contract remedies have been held to be exclusive in other cases where the Court concluded that the parties intended them so to be. Magnolia Provision Co. v. Coleman, Tex.Com.App., 3 S.W.2d 412; Nunn v. Brillhart, 111 Tex. 588, 242 S.W. 459; Buffalo Pitts Co. v. Alderdice, Tex. Civ.App., 177 S.W. 1044; Oltmanns Bros. v. Poland, Tex.Civ.App., 142 S.W. 653; Haynie v. Plano Mfg. Co., 36 Tex.Civ.App. 567, 82 S.W. 532; Adams v. Crittenden, Tex.Civ.App., 191 S.W. 833; First National Bank v. Fuller, Tex.Civ.App., 191 S.W. 830; Fetzer v. Haralson, Tex.Civ.App., 147 S.W. 290; Scottish Union & Nat. Ins. Co. v. Clancy, 71 Tex. 5, 8 S.W. 630. And the vendor's agreement to accept liquidated damages upon his vendee's breach abrogates his right of specific performance. Moss & Raley v. Wren, 102 Tex. 567, 120 S.W. 847, 113 S.W. 739; Tex Louana Prod. & Ref. Co. v. Wall, Tex.Com.App., 257 S.W. 875; Huffhines v. Bourland, Tex. Com.App., 280 S.W. 561.

■ The fact that Combest had an option to declare a forfeiture or not as he thought best is immaterial. Combest's option was to terminate the contract or leave it in force, not to select one or two different methods whereby he might, acting unilaterly, destroy Richards Sr.'s contract rights.

On this record, the forfeiture provision is deemed adequate within the meaning of the comments made in Powers v. Sunylan Co., Tex.Com.App., 25 S.W.2d 808.

■ (D) According to the evidence summarized above, the rights of Richards, Sr., under the contract constituted community property and vested upon his death in his widow and children. Defendant Combest, therefore, could not effect a forfeiture of the rights these people had under the contract unless he performed the same two conditions referred to above, namely, by declaring due the balance of the purchase price and by giving notice of this event to the other parties. We need not decide how these successors in interest of Richards, Sr., were to be made acquainted with Combest's acceleration of payment, nor whether notice had to be given each of them.

(E) Therefore no forfeiture has ever occurred, for defendant Combest never

exercised the powers vested in him under the forfeiture clause in his contract with Richards, Sr. He neither accelerated the payment of the balance owed under that contract, nor did he give any preliminary notice of the forfeiture which he says he declared. According to some of his testimony he did declare a forfeiture, but, as stated above, he evidently gave plaintiffs no notice of this event until it had occurred—or at least his testimony raises the issue that he did not. Such action was based upon a misconstruction of the forfeiture clause.

(F) So, there is evidence showing that the contract between Richards, Sr., and defendant Combest was never forfeited and remains in force.

■ Defendant Combest's testimony indicating that the Richards children agreed to substitute their brother, Richards, Jr., as purchaser in their father's stead will not support the instructed verdict. Mrs. O'Brien contradicted it.

■ Defendant Combest had no right to make the 1944 contract with Richards, Jr., and on the record before us, this contract can only be said to have affected his relations with young Richards. The transactions upon which this 1944 contract was based may have affected the rights of others of the plaintiffs, but there is at least an issue of fact as to whether it did or not, and we note that Combest never identified any member of the Richards family with whom he dealt except F. W. Richards, Jr.

■ Defendant Combest's deed to defendant Howard had no more effect upon the plaintiffs' rights than the other matters referred to above. It depended upon the contract of Richards, Jr., under which Combest said he made it, and it added nothing to the effect of that contract. According to Combest's testimony, it was not intended as a rescission.

(G) No reason appears upon this record, as a matter of law, why plaintiffs should not enforce their inherited contract rights against defendant Howard. (We are not to be understood as expressing any opinion regarding the ultimate effect of the transactions leading up to the making of the contract between Richards, Jr., and defendant Combest.)

■ Mere delay in filing this suit will not bar plaintiffs' recovery, since the suit was filed within four years after the death of Richards, Sr. Art. 5531, R.S.1925; Riley v. McNamara, 83 Tex. 11, 18 S.W. 141.

■ The facts found above raise the issue that defendant Howard took his conveyance with notice of plaintiffs' rights and in such a case, rights enforcible against his vendors are enforcible against him. Langley v. Norris, 141 Tex. 405, 173 S.W. 2d 454, 148 A.L.R. 555. He can be reimbursed for any expenditures which he has made.

■ Defendant Howard, of course, acquired the title of his vendor, Richards, Jr., and in no event could plaintiffs establish more than their respective interests, each of which, if established and declared, would amount to an undivided one-sixth of the property.

We express no opinion as to how the accounts between plaintiffs and defendants shall be worked out.

(H) Defendants have made no point of plaintiffs' failure to prove that an administration upon the estates of their father and mother was unnecessary, but the property evidently constituted the Richards homestead and the failure to make such proof ought not to have resulted in an adjudication of the merits of plaintiffs' claim. See Pure Oil Co. v. Tunnill, 126 Tex. 57, 86 S.W.2d 207. We are inclined to believe that this proof can be made on a new trial or that an exception to the general rule can be established.

■ (I) On the trial of this case, defendant took the position that this suit was in trespass to try title, and that it must fail because plaintiffs did not prove either a legal or an equitable title to the land. This argument has been repeated here. We think that defendants have construed the petition too strictly. The petition does open with allegations in trespass to try title, but beginning with paragraph 3, plaintiffs have made a recognizable at-

tempt to plead a cause of action for specific performance of Richards Sr.'s contract, and this cause of action is plainly alleged to be in the alternative to the preceding allegations in trespass to try title. Defendants made no exception to the petition and any defects in the petition were waived under Rule 90, Texas Rules of Civil Procedure. In determining the nature of the cause of action pleaded, we look to the facts alleged. See O'Neal v. Bush & Tillar, 108 Tex. 246, 173 S.W. 869, page 871 (Hn. 5); Colbert v. Dallas Joint Stock land Bank, 129 Tex. 235, 102 S.W.2d 1031, page 1033 (Hn. 4, 5). Plaintiffs' prayer for title is appropriate to the rights which they seek to enforce.

These conclusions demonstrate that the trial court erred in instructing a verdict, and require that the judgment of the trial court be, and the same is accordingly reversed. There being material issues of fact raised by the evidence, this cause is remanded to the trial court.

## On Rehearing

Defendant's motion for rehearing has been considered.

(1) Defendants say that various conclusions of fact which we have drawn from the record conflict with findings made by the trial court. No findings were made by that court except such as are to be implied from that court's having instructed the jury to return a verdict in defendants' behalf and in having then rendered a judgment in behalf of defendants upon that verdict. Under the points of error assigned by plaintiffs we were required to determine whether there was any evidence before the trial court tending to sustain the plaintiffs' theory of the case, and we intended to do no more in our original opinion than to point out such evidence. We have amended our original opinion, to avoid any misconception of our holdings.

(2) At the foot of our opinion, in Paragraph H, we referred to a failure of proof respecting an administration of the estates of plaintiffs' parents. Defendants say that an administration upon the estate of plaintiffs' father has been opened in the Probate Court of Jefferson County and that one of plaintiffs' counsel has been appointed administrator of that estate. While this court cannot act upon the information set out by defendants, it does appear that plaintiffs' aforesaid counsel, acting as administrator of the estate of F. W. Richards, Sr., filed an application in this court for a writ of error to the trial court to review the judgment constituting the subject matter of this appeal, and that we overlooked this fact in writing our opinion. However, all of these matters are immaterial. The application for writ of error was dismissed before our judgment was rendered in this appeal, and the administrator, if in office, can be made a party to this suit upon removal of the cause to the trial court. From defendants' discussion it might be inferred that no necessity in fact existed for this administration, but this matter only suggests that plaintiffs correctly brought the suit in their own names, alone.

(3) It appears that plaintiffs, acting under authority of an order of the trial court, have withdrawn from the registry of that court the $8,600 which they tendered defendants on the trial of this cause and which, on defendants' refusal, they paid into the hands of the Clerk of the trial court, in defendants' behalf. Defendants say that plaintiffs thus retracted a legally necessary tender of the purchase price due under the contract asserted by plaintiffs, and that plaintiffs ought therefore to be denied a specific performance of that contract. Plaintiffs say that we cannot consider this ground for rehearing. We need not determine whether we can nor cannot; if we could consider the matter, we must nevertheless deny defendants' point.

The certificate of the Clerk of the trial court which is attached to defendants' motion shows that the trial court's order authorizing the withdrawal of the deposit was made after this appeal had been submitted to this court for decision, and that the deposit was withdrawn still later. We may accordingly assume that the trial court's order was erroneous because jurisdiction of the subject matter of the appeal was vested exclusively in this court, without regard to whether the or-

der was erroneous on any other ground. Regarding the ownership of, and the trial courts' general power of control over this deposit, see: Texarkana & Fort Smith R. Co. v. Brinkman, Tex.Civ.App., 288 S.W. 852, page 854, affirmed, Tex.Com.App., 292 S.W. 860, 862; Republic Insurance Co. v. Highland Park Independent School Dist., Tex.Civ.App., 123 S.W.2d 784, page 790; 40 Texas Jur. 855, Sec. 18; 20 Texas Jur. 582, Sec. 5; 52 Am.Jur. 247, Sections 46 and 47.

■ However, plaintiffs' reply to defendants' motion rebuts defendants' argument. The trial court's order was made pursuant to a written motion by plaintiffs, and a certified copy of this motion is attached to plaintiffs' reply to defendants' motion for rehearing here. In the motion which they filed in the trial court, plaintiffs alleged, in substance, that letting the money lie idle in the Clerk's hands accomplished nothing, that if their appeal was granted the cause would be remanded to the trial court and the money could again be paid into the registry of the court (and of course if their appeal was denied, the money would be returned to them). They directed the trial court's attention to the fact that defendants had refused their tender, and said, in effect, that they were still willing to pay defendants. In their reply to defendant's motion for rehearing in this court, they cite the rule excusing a tender which will not be accepted.

It thus appears that nothing has occurred in the trial court which cannot be remedied in that court upon another trial of this cause. Under defendants' theory of the case, the $8,600 deposit was only a form of security, and defendants have suffered no permanent loss. The record presented to us shows that plaintiffs desired to act under authority, without intending any abandonment of their suit or of their willingness to pay defendants the purchase price of the land. No bad faith appears and we may properly remit defendants to the trial court for relief in this, as in the other matters involved in this suit.

It is also apparent from this record that defendants would never have accepted any tender had it been made to them at any time after this controversy arose. See Wright v. Young, 6 Wis. 127, 70 Am.Dec. 453.

■ (4) We have reconsidered the merits of this appeal, but see nothing in the record *now* before us which would authorize us to deny the enforcement of plaintiffs' contractual rights *as a matter of law*. According to plaintiffs' theory of the facts, the various breaches of the buyer's promise to pay were not contumacious. There has been some delay in the assertion of plaintiffs' rights, but this delay is presently immaterial because there is no proof (as there was in Herman v. Gieseke, Tex. Civ.App., 33 S.W. 1006) that this delay amounted to laches, and there is evidence that defendants had notice of plaintiffs' rights when such changes as were proved occurred in defendants' situation. Finally, according to plaintiffs' theory of the facts and our construction of the contract, this contract remained in existence despite the various breaches of the buyer's promise to pay. Only within the limitations stipulated in the forfeiture clause was the time of the buyer's performance (of his promise to pay the price) of the essence of the contract. Paragraph Fifth of the contract does provide: "it is agreed that time is of the essence of this contract—", but this expression must be construed with the forfeiture clause and when it is, it adds nothing to the vendor's rights. For to say that the time of the buyer's performance of his promise to pay the price was of the essence of the contract is but another way of saying that the vendor could forfeit the buyer's contractual rights if the buyer failed to pay at the stipulated time. And as we construe the contract, vendor and buyer put the forfeiture clause in the contract to provide a remedy for this very situation and intended it to be the vendor's only unilateral remedy for that situation. The expression "Time is of the Essence" was defined in Williams v. Shamrock Oil & Gas Corporation, 128 Tex. 146, page 153, 95 S.W.2d 1292, 1295, 107 A.L.R. 269, as follows: "it is well to keep in mind the meaning of the expression, 'time is of the essence of the contract.' Page on Con-

tracts, vol. 4, § 2103, defines it as follows: 'When it is said that time is of the essence of a contract, it means that the provision in the contract which fixes the time of performance is to be regarded as a vital term of the contract, the breach of which may operate, at the election of the party not in default, as a discharge of the entire contract.'" And to the same effect, see Williston on Contracts, Section 846, and Pomeroy's Equity Jurisprudence, 4th Ed., part 3 of the note on p. 3341. Since the contract remained in existence and was of the sort which may be specifically enforced, and since the proof respecting matters other than the contract fails to show *as a matter of law* any reason for denying enforcement of the contract, plaintiffs made a prima facie showing that they owned rights under this contract which ought to be enforced. If defendant Howard bought with notice of plaintiffs' rights (and there is some evidence that he did), then under this prima facie showing he acquired and now holds the legal title as trustee for plaintiffs to the extent of their respective undivided interests. Of course we are not to be understood as having finally determined the rights of the parties respecting any matter discussed by us; all we are concerned with here is whether the trial court should have instructed a verdict, that is, whether there is any evidence in the record in plaintiffs' behalf.

Defendants refer to the fact that plaintiffs were not bound by their father's contract, but this is immaterial. The estate of their father was bound, and plaintiffs were in court, offering to pay the price. The buyer's right to acquire the land upon paying the price passed to plaintiffs and their brother under the statutes of descent and distribution, and plaintiffs' share of this right, 5/6ths, could be established and enforced in this suit; the entire title was before the trial court, the legal title owned by defendant Howard and the equity owned by plaintiffs and by Howard in common.

Defendants refer to plaintiffs' delay in making tender. They say that the suit was not filed until November 14, 1945, "more than a year after last default in payment of the purchase price" under the contract asserted by plaintiffs, and that plaintiffs did not actually tender the price until November 19, 1946, a year later. Under the circumstances related above, this delay in tender is immaterial, if it could be of any significance. It also seems evident (on the record before us) that no tender by plaintiffs after this controversy arose would have been accepted. Although we have considered this argument, there is nothing in the record to show when the suit was filed. The original petition is not in the transcript, but we note that the amended petition on which the case was tried expresses (in words) a tender of the balance of the price.

Defendants press their argument that vendor Combest had a right to rescind the contract because the buyer's promise to pay the price was breached, and they cite in support the decisions in Herman v. Gieseke, Tex.Civ.App., 33 S.W. 1106, and Hudson v. Norwood, Tex.Civ.App., 147 S.W.2d 826, which they say we "passed over". We have not denied that such a right as defendants claim Combest had may exist in favor of a vendor, and there is nothing in our opinion in conflict with the decisions cited by defendants. At the bottom of our decision is a question of the construction of a particular contract, and this question was not considered in any of the decisions to which defendants have referred. Our opinion is not based upon any doctrine of waiver.

The defendants' motion for rehearing is overruled.