ALICE STOUT, Respondent, v. J. T. NORTH, Appellant.

In the Kansas City Court of Appeals, June 12, 1922.

1. **LANDLORD AND TENANT: Leases: If Wording of Lease Justifies it There is Reason for Distinction Between Privilege of Extention and Right to Renew.** If the wording of a lease justifies it, there is good reason for the distinction between a privilege of an extention and a right to renew.

2. ———: ———: **Lease With Privilege of Renewal Required Affirmative Action on Part of Both Lessor and Lessee to Create Status of Landlord and Tenant Between Them for Additional Term.** Where lease provided that defendant, lessee, was to have privilege of renewal of lease for four years longer upon the same terms and conditions as this lease, and one of the terms was that the rent, payable December 1, was to be secured by a note approved by the lessor, the lessee would have to furnish and present a rent note and lessor approve the same before or at beginning of the year, before the relationship of landlord and tenant could continue under the renewal privilege.

3. ———: ———: **Rule that Clauses in Lease Providing for Payment of Rent in a Specified Time Are, in absence of Forfeiture Clause, Mere Covenants, Held Not Applicable on Question of Lessee's Right to Another Term.** The rule that clauses in a lease providing for payment of rent in a specified time are, in the absence of a forfeiture clause, mere covenants, and the violation thereof affords no ground for forfeiture, does not apply where there is a controversy as to whether lessee was entitled to another term.

4. ———: ———: **A general Covenant to Renew a Lease is Indivisible and Must be Exercised in Its Entirety.** A general covenant to renew a lease is indivisible and must be exercised in its entirety, and where one of the terms of the privilege of renewal of lease was that the rent was to be secured by a note approved by lessors, mere notice of an intention to stay and thereafter holding over without doing anything else, are not sufficient to call the renewal into existence.

5. **APPEAL AND ERROR: Judgment: Remittitur: Re-entry of Judgment at Same Term on Remittitur by Plaintiff Reducing Amount Below Minimum Limit Did Not Harm Defendant.** In an action of unlawful detainer where the verdict was in the exact form prescribed

by statute, section 3009, Revised Statute 1919, and the judgment rendered thereon was in strict accordance with section 3012, Revised Statute 1919, and followed the verdict, but the verdict fixed the value of monthly rents and profits at an amount greater than the complaint stated or the evidence showed, notwithstanding section 1423, Revised Statute 1919, provided that jurisdiction to fix amount of rents and profits is with the jury and not the court, the re-entry of the judgment (at same term as the other judgment) on *remittitur* by plaintiff, reducing the amount below the minimum limit, did not harm the defendant.

6. **JUDGMENT: Damages: Remittitur: When Judgment Excessive it Can be Cured by Remittitur and Court Has Power to Render Proper Judgment Thereon.** When a judgment is for too much and it can be cured by a *remittitur*, the court has power to act on it and render the proper judgment.

Appeal from the Circuit Court of Jackson County.—*Hon. O. A. Lucas,* Judge.

AFFIRMED.

*A. F. Evans* and *H. H. Thurston* for respondent.

*E. C. Hamilton* and *Prince, Hamilton, Harris & Beery* for appellant.

TRIMBLE, P. J.—Plaintiff, owner of a farm leased to defendant, brought this action in unlawful detainer, under the first clause of section 2995, Revised Statutes 1919, which provides that "when any person shall willfully and without force hold over any lands, . . . after the termination of the time for which they were demised or let to him . . . such person shall be deemed guilty of an unlawful detainer." The complaint alleged damages for the detainer in the sum of $375 and placed the value of the rent and profits at $75 per month.

A trial in the justice court resulted in a judgment for defendant, whereupon appeal was had to the circuit court where, after the evidence was in, the court directed the jury to find for plaintiff for possession of the premises leaving the jury to separately fix the damages and the

monthly rents and profits as shown by the evidence. The jury thereupon returned a verdict finding defendant guilty in manner and form as charged in the complaint, fixing the damages at one cent, and the value of the monthly rents and profits at $97.20, which, as will be observed, is larger than the amount fixed in the petition. On this verdict judgment was, on May 11, 1921, rendered for possession of the premises and for two cents damages, and for $194.40, being double the amount found by the jury as the monthly rents and profits of the said premises from date of judgment until restitution be made, and for costs, with an order for execution and writ of restitution to issue.

After motion for new trial was filed by defendant, plaintiff on May 28, 1921, entered a remittitur of $111.58, "and at that rate per month from the judgment," whereupon the court set aside the judgment of May 11, 1921, and re-entered judgment for two cents, being double the amount assessed by the jury for plaintiff's damages, and also rendered judgment for $83.32 "being double the monthly value of the rents and profits of said premises from the date said original judgment was rendered and entered until restitution of said premises be made," and for costs, with writ of execution and restitution to issue. The defendant thereupon appealed.

On the 12th of February, 1920, plaintiff in a written lease of that date, demised to defendant a farm of eighty-four acres "for the term of one year, beginning the 1st day of March, 1920, and ending February 28, 1921;" the defendant agreeing "to pay as rent for said premises the sum of Five Hundred ($500) dollars, payable December 1, 1920, and and to be *secured by a note approved by first party* (plaintiff), said note to draw interest from maturity at eight per cent per annum."

It was further provided in said lease that plaintiff was to put the outside fences in good shape with a "four wire fence;" the inside fences to be repaired by her as they then stood on said farm, and defendant was to thereafter keep said inside fences in repair, the plaintiff,

however, to furnish the materials for keeping the then existing inside fences in repair and the defendant to do the work without renumeration. Should defendant build any fences or erect any buildings at his own expense during the term of the lease, he was to have the privilege of removing same at expiration of the lease. Plaintiff. was to furnish roofing for a cow barn and defendant to do the work at his own expense using the material then in the old barn. Plaintiff was also to move an old house back and repair the guttering. The provision of crucial importance in this controversy is that defendant lessee was "to have the privilege of renewal of this lease for four years longer, provided said place is not sold, said renewal to be upon the same terms and conditions as this lease."

Instead of executing the note with security as called for in the lease, defendant North, on the day the lease was executed, February 12, 1920, paid in cash to plaintiff the then present value of such note, discounted as if it had been executed, and on February 14, 1920, entered into possession under said lease and continued in possession throughout the said first year term and thereafter.

The trouble between the parties is not over the tenancy of the first year, but arises over the renewal of the lease under the provision relating thereto.

Defendant, making no distinction between a present demise for five years and a lease for one year with a privilege in him (if he exercised it) of renewing it for four years, but having the idea that his lease was of the former kind, did nothing in the way of exercising his privilege of renewal, except as now stated. When plaintiff, through her legal adviser, wrote to defendant on December 29, 1920, asking him "to advise me without delay whether you want to renew the lease," he went to the attorney's office a few days thereafter and told him he "would not have taken a shot at it for just one year" with the work he had done, and that he "expected to stay there the full four years." He laid before the attorney certain mat-

ters in reference to things plaintiff in the lease had agreed to do but which defendant claimed she had not done, and asked that she fulfill her part of the contract. The attorney replied by asking: "Do you want the place?" and defendant gave the answer hereinabove quoted. The attorney then told defendant he would take the matter up with plaintiff and let defendant know in a few days. Nothing was intimated, suggested or said, either on the part of the attorney or the defendant, concerning the drawing up of a new lease; and the tenant went back to the farm and began doing some work—concededly not a great deal, fixing some fence—preparatory to staying there.

Defendant heard nothing from the attorney, however, until on March 4, 1921, when there was served upon him a written notice to quit and deliver possession on or before March 20, 1921. Thereupon defendant wrote plaintiff on the same day, March 4, 1921, that "it is my purpose and intention to occupy said premises for a four year term beginning March 1, 1921, having heretofore signified my intention so to do in the statement made to your attorney . . . in response to his letter of inquiry relative to my purposes and intentions in relation thereto." He further added that: "I shall expect you to fulfill upon your part the terms of said contract of lease."

On March 7, 1921, he further wrote plaintiff: "I am ready to settle with you for this year's rent on your farm according to agreement. Kindly meet me at the Raytown Bank whenever it is convenient, advising me of the time, and oblige." At the trial he sought to show that he had arranged with the bank to secure the money for the year's rent, but the court excluded this evidence. Plaintiff paid no attention to the defendant's communication, but steadily pursued her suit, insisting upon a termination of the tenancy after the end of the term first specified in the lease.

It is necessary to first ascertain the true character of the lease in controversy. Is it a present demise of

the farm for an extended term, to take effect at the option of the tenant; or is it merely a lease for one year, with the privilege of a renewal thereof for a term of four years, if the tenant chooses to exercise such privilege in accordance with the terms thereof? While it has been sometimes stated generally that courts refuse to recognize any distinction between the "renewal" of a lease and the "extension" thereof, nevertheless that is true only in cases where the lease itself appears to make no distinction. The parties undoubtedly have a right to contract for one or the other, and if the contract calls for a distinction, it must be made. As said in Underhill on L. & T., sec. 803, "the question is always one of construction depending upon the language of the lease in each particular case." In the case of Insurance Co. v. National Bank of Missouri, 71 Mo. 58, 60, our Supreme Court, in doubting whether there was any distinction between *renewal* and *extension,* limited the application of its ruling by carefully saying that it was considering the terms "as employed in the lease before us." If the wording of a lease justifies it, there is good reason for the distinction between a privilege of an extension and a right to renew. For "an agreement for an option of renewal would seem to imply that the parties contemplated some affirmative act by way of the creation of an additional term." [16 R. C. L., sec. 399, p. 895.]

Now, we think the lease in the case at bar calls for such distinction. In the first place it creates a lease for the first year and explicitly specifies that the term *is to end February 28, 1921.* In the next place, the lease expressly states that the privilege of renewal is granted but it is "to be on the *same terms and conditions* as this lease." One of those terms was that the rent of $500 payable December 1, was "to be *secured* by a note *approved by said first party,* said note to draw interest from maturity at eight per cent per annum." It would seem that this necessarily implies that there was to be security on the note else there would be nothing for first party to approve except the form of the note, and the

mere giving of lessee's note would not necessarily "secure" the rent. This would also seem to require *affirmative action* on the part of both lessee and lessor to create the *status* or relation of landlord and tenant between them for the additional term. The lessee would at least have to furnish and present a note, and the lessor approve the same, before the relationship of landlord and tenant could continue further. It is true the lease says nothing about the execution of a new lease or renewal, and it would seem none would be necessary; but this is not wholly decisive of the matter, since the requirement of the note and its approval is not thereby abrogated, and the observance thereof would be the equivalent of a new lease. [16 R. C. L., sec. 392, p. 889.] By the very terms of the lease, before the relation of landlord and tenant could come into existence even for the first year specified therein, the lessor had to be satisfied with regard to the payment of the rent; and since the renewal was to be upon the same terms, the landlord had to be satisfied in regard to the rent, at least as to each year as it rolled around, before the relation under any further term could come into existence. While the renewal clause, if the lessee chose to exercise the privilege granted under it, would create another term of four years and bind him to take the land for that length of time, yet, whether the exercise of the renewal privilege required the lessee to secure, at one time, the rent for the entire four years or merely obligated him to furnish an approved note for the rent of each year as it approached, does not appear to be necessary for us to decide, since the lessee made no attempt to do either until after the lessor had brought this suit.

So that the lease in controversy is something different from those leases wherein there is a mere present demise of the farm for the extended or renewal term of four years, dependent simply on the lessee's election to hold for said term. To effectuate such renewal he must comply with *all the terms of the renewal privilege,* the most important one of which was that he must proffer

an approved note for the rent, which he did not do. As the giving of an approved note was one of the terms and conditions in which the term for the first year arose, so, during the four year's renewal, at least the rent note of each year therein should be given or proffered for approval before or at the beginning of that year. The lessee had to do this in order to exercise his privilege according to its terms. Consequently neither his mere holding over after the expiration of the first term, nor the giving of notice to plaintiff through her legal adviser that lessee intended or expected to stay the full four years, could be sufficient. Lessee is in the position of having notified lessor that he intended to comply with the terms of his privilege to renew, but never did.

Defendant, however, in view of the fact that the lease contains no clause of forfeiture for failure to pay rent on time, invokes the general rule that clauses in a lease providing for payment of rent in a specified time, are, in the absence of a forfeiture clause, mere covenants, and the violation thereof affords no ground for forfeiture. To this we must reply that this is always where there is a lease that has gone into effect, while the situation here is that no tenancy for any term beyond the first year has come into existence. As said in Renoud v. Daskam, 34 Conn. 512, 516, "this is not a case of forfeiture for the non-payment of rent, but a case where the petitioner (defendant in this case) has neglected to perform the condition on which his right to another term depended."

As we view the matter and construe this lease, it was for a term of one year "ending February 28, 1921" with the privilege in defendant of having it for another term of four years if he placed himself in position to entitle him to it, that is, exercised the privilege in accordance with its terms. [Vincent v. Laurent, 165 Ill. App. 397, 402; Willis v. Weeks, 129 Ia. 525, 528; Mershon v. Williams, 62 N. J. L. 779, 782.]

By the terms of the lease, as we have heretofore shown, it could be renewed on the "same terms and con-

ditions'' as the lease for the year. This called for affirmative action .on the part of the lessee beyond the mere notice that he elected to take the further term. He had to furnish an *approved* note for the rent, either for the entire four years or for each year as it approached (which of these we need not say since he did neither). The approval of this note also allowed to the lessor a certain amount of affirmative action (within very narrow limits it is true but very important since it pertains to the security of the rent), before the renewal term came into existence. If the privilege of renewal was to be exercised at all, it had to be exercised in accordance with its terms. A person cannot chose to take merely a part of it and neglect the rest. [Fox v. Windes, 127 Mo. 502, 512; Beavers v. Farmer's etc. Bank, 177 Mo. App. 100, 105; Sage v. Finney, 156 Mo. App. 30, 42.] If the lessor had to be satisfied as to the payment of the rent for the one year, and the renewal was to be on the same terms and conditions, it would clearly seem that she would have to be satisfied in that regard as to any renewal. [Piper v. Levy, 38 So. 448; Woodcock- v. Roberts, 66 Barb. 498, 501.] A general covenant to renew is indivisible and must be exercised in its entirety. [16 R. C. L., sec. 388, p. 885.] Consequently, in this case, as already stated, mere notice of an intention to stay and thereafter holding over without doing anything else, are not sufficient to call the renewal into existence. This is not a case wherein the lessor has *acquiesced* in the renewal or has done something necessarily implying that she consented thereto or is estopped from denying same, nor is it one where the lessor is seeking to hold defendant liable for the rent of the renewal term. Therefore general expressions, in such cases, to the effect that by holding over, the tenant is deemed to be holding under the privilege of renewal, have no application to the case at bar. Lessor in this case is not in any of the positions above indicated. She has merely waited until the lessee failed, during the

first term or at the end thereof, to comply with the provisions of the renewal, and then stood upon her strict rights, refusing to agree to any further tenancy between them.   Unless all the terms and conditions of the renewal privilege have been complied with, she is not compelled to further accept defendant as a tenant.   Compliance with only a part, but not all, of the terms and conditions of the renewal privilege leaves him in no better situation that if none had been complied with.   It is held that even though the time for the exercise of the election to renew is not expressly limited, the lessee must nevertheless exercise his election to do so before the the expiration of the term.   [16 R. C. L., sec. 396, p. 893; 18 Am. & Eng. Ency. of Law (2 Ed.), 692.]   In the case of Renoud v. Daskam, 34 Conn. 512, it was held that a failure to exercise the privilege of renewal during or at the expiration of the first term entitled the lessor to insist upon the termination of the tenancy and that an offer to comply made two days after the expiration of the first term was too late and did not entitle the lessee to relief even in equity.   In I. X. L. Furniture etc. House v. Berets, 32 Utah, 454, a similar ruling was made.   Consequently, the fact that after the expiration of the first term, and after the time when the renewal term was to begin, and after plaintiff had begun steps to put defendant out, he *then* sought to arrange at the bank for the rent of the next year and invited plaintiff to meet him there and *settle with* him as to such rent, can have no efficacy in affecting or changing the *status* that then existed between them.

Nor does the fact that plaintiff's legal adviser promised defendant to lay the matters he was complaining about before plaintiff, make any difference.   These matters were not in answer to anything the attorney wrote to him about.   They were matters raised solely by defendant, and the only implication made by the complaint in regard to them was that lessee, on account of them, might not choose to renew.

In view of the foregoing, we are of the opinion that as defendant's own evidence shows that he did not comply with the terms and conditions of his privilege of renewal, the trial court did not err in directing the jury to find for plaintiff on the question of unlawful detainer. In this holding, it may be well to state that this is not an *equity* suit, nor even one in which equitable principles can be applied. It is a suit in unlawful detainer where the rights of the parties must be determined according to the strict, hard letter of cold *law*. So that whatever intimation the record may carry that plaintiff, anxious for one reason or another to get rid of the inconvenience of so long a tenancy as the renewal clause may create, has remorselessly seized upon the opportunity afforded by defendant's careless failure to preserve his renewal rights, nevertheless we are in no position, in a case of this nature, to grant him any relief by the application of equitable principles.

There was no error in the court's action on the *remittitur* filed by plaintiff. The verdict was in the exact form prescribed by the statute, sec. 3009, Revised Statutes 1919. It was neither uncertain nor ambiguous. The judgment rendered thereon was in strict accordance with the Statute (sec. 3012, R. S. 1919) and followed the verdict. The only thing wrong was that the verdict fixing the value of the monthly rents and profits was for more than the complaint stated or the evidence showed. Hence it and the judgment rendered thereon were excessive. In other judgments, however, this feature has been corrected by a remittitur and a reentry of judgment.

According to the evidence, the value of the monthly rents and profits was $65 or $70. According to the amount fixed by the lease which defendant was willing to pay, it was $41.66 per month. The *remittitur* entered by plaintiff on the judgment of $194.40 (double the amount in the verdict) was of $111.08 "and at that rate per month from the judgment," and left the amount still in the doubling judgment at $83.32 which meant that

the value of the rents and profits was reduced to the basis of $41.66, the least or minimum of anything shown in the evidence. Consequently when the judgment was reentered (at the same term as the other judgment), it was for double the one cent damages and double the $41.66 monthly rents and profits. It is true, *jurisdiction* to fix the amount of the rents and profits is with the jury and not the court. [Sec. 1423, R. S. 1919.] But here the jury fixed the amount but fixed it too large, and larger than they had any power to do. The court, in the reentered judgment, merely reduced the amount below the minimum limit and was authorized to do so by the *remittitur*. The defendant was in no wise harmed by that. [See sec. 1513, R. S. 1919.] When a judgment is for too much and it can be cured by a *remittitur*, the court has power to act on it and render the proper judgment. [Tilford v. Ramsey, 43 Mo. 410; Kelly v. Higginsville, 185 Mo. App. 55.] In the former case it is said "any court that has power to render judgment should accept the remittitur and render judgment for the true amount." [See, also, sec. 1514, R. S. 1919.]

The judgment is affirmed. All concur. .