TAMKO ASPHALT PRODUCTS, INC., Plaintiff-Appellant,

v.

G. J. FENIX, Defendant-Respondent.

No. 7697.

Springfield Court of Appeals.

Missouri.

Dec. 29, 1958.

Motions for Rehearing or to Transfer Overruled March 10, 1959.

Roberts & Fleischaker, Joplin, for plaintiff-appellant.

Paul E. Bradley, Joplin, for defendant-respondent.

STONE, Presiding Judge.

This is a suit by plaintiff, Tamko Asphalt Products, Inc. (hereinafter called Tamko), to enjoin defendant, G. J. Fenix, from interfering with Tamko's exercise of its alleged right to enter upon land presently owned by Fenix and to remove therefrom the remainder of a chat pile. Whether Tamko has such right depends upon construction of a written contract (hereinafter referred to as the contract) executed under date of August 15, 1945, on behalf of Jasper County Royalty Company (Fenix' grantor) and E. L. Craig (Tamko's assignor). By the contract, the Royalty Company sold to Craig, as "personal property," all chat on a described quarter section "known as the 'Athletic *Chatt* Pile'" for the sum of $6,000. In paragraph IV of the contract, the parties agreed that the buyer (Craig) "shall have the privilege of placing all necessary machinery and equipment on the real estate above described to facilitate the removal of said *chatts,* and * further * , time being of the essence of this provision, that buyer shall remove all of said *chatts* from said real estate on or before August 15, 1955, provided, however, that if on August 15, 1955, buyer shall not have removed all of the *chatts* from said property and desires to continue to remove *chatts* therefrom after said date, he shall have the privilege of so doing upon payment to sellers (Royalty Company) of the sum of $150.00 cash in advance annually as rental on the real es-

tate above described during the period in which said continued removals may be made. Said sum of $150.00 shall be payable on Aug. 15, 1955, and annually thereafter for each calendar year or fraction thereof during which continued removal operations may be conducted." Paragraph V of the contract provided that "all machinery and appliances placed on the real estate * * by buyer shall remain his property and may be removed by him at any time prior to August 15, 1955." By paragraph VII, the buyer was given the right "at his own expense, to construct and maintain a railroad switch or switches for use in removing said *chatts.*" Paragraph VIII stated "that buyer intends to process the *chatts* above described" and that "in the event buyer should process (on the described quarter section) *chatts* derived from any source other than the real estate above described," buyer should pay to the Royalty Company "a rental of $150.00 per year for each year or any portion thereof in which said processing may be conducted."

Following trial, the court made a general finding against plaintiff Tamko on its petition for injunctive relief; and, in response to the counterclaim of defendant Fenix seeking a declaratory judgment, the court found that "plaintiff (Tamko) failed to make performance of the contract * * * as required by the terms and provisions thereof" and entered a declaratory judgment that "by reason of plaintiff's lack of performance * * * said contract ended and terminated on August 15, 1955," that buyer's title to and interest in the chat "was subject to defeasance as to such of the *chats* as were not removed at the time of termination of said contract," that Tamko had no right to extend the term of the contract or to enter upon the described quarter section and remove chat therefrom after August 15, 1955, and that Tamko now has no legal or equitable interest in the remaining chat. From that decree, Tamko appeals.

E. L. Craig was president of Tamko Asphalt Products, Inc., when he purchased the chat pile in August 1945, and was chairman

of the board of directors when the instant suit was tried in December 1956; and, at all times herein material, Craig has been Tamko's "principal stockholder." In the conduct of its principal business, i. e., the manufacturing of asphalt composition roofing, Tamko requires colored granules to cover the roofing; and, pursuant to Craig's stated contractual intention "to process the *chatts,"* he promptly constructed a plant (on the land described in the contract) "for the manufacture of * roofing granules." Tamko "purchased ninety-nine per cent" of the granules processed in this plant. Records showed that Craig removed a total of 2,608 tons from the chat pile on 128 days during 1946, a total of 9,198.5 tons from the chat pile on 328 days during 1947, a total of 2,990 tons from the chat pile on 159 days during 1948, and a total of 508 tons from the chat pile on 32 days during 1949. No records of removals from the chat pile were kept thereafter.

On December 30, 1950, Tamko purchased from Craig for $20,000 all of Craig's rights under the contract and the processing plant near the chat pile. In 1951, Tamko "oiled some granules" at that plant although not attempting "to cover any with the coloring dye," but Tamko admittedly had not used or operated that plant for five years prior to the trial in December 1956. As designed and constructed to furnish colored roofing granules, the plant contained machinery and equipment for "crushing, screening, drying, * coloring and storing." At a time not fixed in the record, "the storage bins and the coloring unit" were moved from the plant; and, about December 1952, "the motors and electrical equipment were removed to prevent theft." In the present condition of the plant with "most of the lumber * * * pretty well rotted," Fenix said that "I wouldn't pay $500 for it"; and, although the tenor of Tamko's evidence was that the plant was more valuable, there was no showing as to the reasonable market value or worth of the plant at any time.

After Tamko's acquisition of the chat pile from "principal stockholder" Craig on De-

cember 30, 1950, its removals of chat were relatively insignificant, trifling and unimportant in volume and obviously irregular, desultory and sporadic in time. Notwithstanding the opinion of Tamko's manager that "we have moved some (chat) out every month," he estimated *aggregate* removals of only 1,000 to 1,100 tons from the chat pile during the last five years of the ten-year term of the contract (those removals having been "for building and road purposes" at Tamko's roofing plant, not for the processing of colored roofing granules), leaving approximately 100,000 tons in the chat pile when the ten-year term expired on August 15, 1955. Fenix thought that, after he had acquired title to the quarter section on which the processing plant and chat pile were situate, "subject to * * * existing contracts for removal and sale of tailings (chat)," by warranty deed dated May 7, 1951, for a recited consideration of $8,800, "less than 500 tons" of chat had been removed and "Tamko has not removed half of that—it has been done by people that have come in and taken a load of tailings." The only explanation of Tamko's termination of operations in its processing plant or of the marked decrease in removals from the chat pile after 1949 is suggested in this answer to an interrogatory: "The plant * * was last used for making roofing granules in 1949 and thereafter maintained *on a stand-by basis* by Tamko * * for use in connection with the operation of its roofing plant." (All emphasis herein is ours.)

As to the period of time within which the entire chat pile could have been removed from Fenix' land "by reasonably diligent effort," Tamko's evidence was that "it would take twenty weeks at least if you loaded (chat) every day and you would have to have a market to do that." The same witness thought that there was "no such market as that right now" when the case was tried on December 17, 1956, apparently because the market for chat is "not too good" in the winter; but, there was not a scintilla of evidence as to the market for chat at any time during the ten-

year term of the contract. Fenix testified that "six months would be a reasonable time to remove that (chat) pile, counting car shortages, breakdowns and only working eight-hour shifts."

The chat pile covers an area about 500 feet square—"somewhere around two acres" —in an old mining territory about one mile north of Duenweg, Jasper County, Missouri. With a view to further mining or prospecting, Fenix made two unsuccessful efforts (the latter during the Winter of 1955) "to dewater" an abandoned mine shaft within 75 feet of the chat pile, but "with one 10-inch pump we can't beat the water." The ground under the chat pile would not be suitable for agriculture. The value of the chat is between 5¢ and 10¢ per ton.

On July 22, 1955, Tamko mailed to Fenix its check for $150 "to renew our lease" (as Tamko's treasurer said) for a one-year period after August 15, 1955, the end of the original ten-year term of the contract. This check was returned to Tamko uncashed with a letter from Fenix (on his attorney's letterhead) dated February 8, 1956, which stated, in part, that "I (Fenix) cannot accept the check as all your rights under the contract terminated on August 15, 1955." Prior to August 15, 1955, Fenix had neither written to nor talked with any representative of Tamko concerning removals from the chat pile.

On this appeal, Tamko's position is, in substance and effect, that the contract permitted and provided for successive one-year extensions or renewals after August 15, 1955, *as a matter of right,* without regard to the nature, extent or continuity of removals from the chat pile during the ini-

tial ten-year term of the contract; but that, if the contract be construed as having required a bona fide effort on the part of the buyer of the chat pile to remove it during said ten-year period, we now should give Tamko "a reasonable time within which to remove the *chats,*" Tamko's suggestion being that "a reasonable time would have been a period of several years at least to remove *chats* of this quantity in order to permit the removal without sacrifice." On the other hand, Fenix insists that the contract clearly contemplated and required, as a condition precedent to extension of the initial ten-year term, a bona fide effort (i. e., an effort "without fault, neglect or delay") by the buyer of the chat pile to remove it within said ten-year period; and that, absent proof of such bona fide effort to remove or of a valid excuse for failure to make such effort, the trial court properly found that Tamko had no right to an extension and that its defeasible title to the remainder of the chat pile revested in the landowner.

■ As Tamko emphasizes, a contract must be construed in its entirety,[1] giving effect to every part thereof, if that be fairly and reasonably possible;[2] and, in construing a contract of doubtful meaning, the court properly may consider the subject matter of the contract, the facts and circumstances attending execution thereof, and the apparent purpose which the parties were undertaking to accomplish.[3] Other principles of contractual construction, urged by Tamko, which are just as sound, well-established and undisputed, may be stated thus, i. e., that, where the language of an agreement is not consistent throughout, the intention of the parties, as gathered from the entire instrument, must prevail over the

1. In re Collins' Trust Estate, 354 Mo. 614, 190 S.W.2d 259, 262(4); Mathews v. Modern Woodmen of America, 236 Mo. 326, 139 S.W. 151, 155; Johnson County v. Wood, 84 Mo. 489, 509–510.

2. Ott v. Pickard, Mo., 237 S.W.2d 109, 111(3, 4); Swinney v. Continental Bldg. Co., 340 Mo. 611, 102 S.W.2d 111, 121 (5); Fancher v. Prock, 337 Mo. 1119, 88 S.W.2d 179, 182(4); Thomas v. Util-

ities Bldg. Corp., 335 Mo. 900, 74 S.W. 2d 578, 581; Myers v. Union Electric Light & Power Co., 334 Mo. 622, 66 S.W. 2d 565, 568(1).

3. Veatch v. Black, 363 Mo. 190, 250 S.W. 2d 501, 507(3); Kansas City Structural Steel Co. v. Utilities Bldg. Corp., 339 Mo. 68, 95 S.W.2d 1176, 1177(1), 106 A.L.R. 244; Larson v. Crescent Planing Mill Co., Mo.App., 218 S.W.2d 814, 819(3).

strict letter of the contract;[4] that greater regard is to be accorded to the clear intention of the parties than to any particular language used in attempting to express that intention;[5] that the construction of an agreement of doubtful meaning should be such as is fair and reasonable between the parties;[6] and, that "'(c)ommon sense and good faith are the leading characteristics of all interpretations.'" Veatch v. Black, 363 Mo. 190, 250 S.W.2d 501, 507; Paisley v. Lucas, 346 Mo. 827, 143 S.W.2d 262, 268. But, both Tamko and Fenix recognize, as they must, that the lodestar of contractual construction is the intention of the parties, and that the primary and cardinal rule, which permeates and pervades the entire field of construction, is that the court should ascertain and (unless in conflict with some positive rule of law) then give effect to such intention. Cook v. Tide Water Associated Oil Co., Mo.App., 281 S.W.2d 415, 420(9); Hogue v. Wurdack, Mo.App., 298 S.W.2d 492, 495(4). So, our basic problem is to determine whether, by the contract under consideration, the parties thereto intended (as is inherent in Tamko's position here) to permit and provide for successive one-year extensions after August 15, 1955, by the buyer of the chat pile, *as a matter of right,* without regard to the nature, extent or continuity of removals from the chat pile during the ten-year term of the contract, or (as Fenix here insists) to prescribe and require, *as a condition precedent to extension,* a bona fide effort by the buyer to remove the chat pile within said ten-year period.

■ Attending first to the language of paragraph IV of the contract, we find the plain requirement, stated in unequivocal and mandatory terms, that "time being of the essence of this provision, * buyer shall remove all of said *chatts* from said real estate on or before August 15, 1955," immediately beclouded by the contradictory and repugnant proviso "that if on August 15, 1955, buyer shall not have removed all of the *chatts* from said property and desires to continue to remove *chatts* therefrom after said date, he shall have the privilege of so doing," etc. The clause "time being of the essence" ordinarily means that the contractual provision fixing the time of performance is to be regarded as a vital term of the contract;[7] and, if the parties definitely agree that time shall be treated as an essential element of performance and thus as a necessary prerequisite to the right to require counter-performance [Williston on Contracts (Rev.Ed.), Vol. 3, § 846, loc. cit. 2372], "there is no reason why the courts should not enforce their *clearly expressed intention* to that effect." Ottumwa Bridge Co. v. Corrigan, 251 Mo. 667, 688, 158 S.W. 39, 45. But, for time to be of the essence of a contract, it must have been so intended by the parties [Erie City Iron Works v. Ferer, Mo.App., 282 S.W. 470, 472(1)]; and, although an express contractual provision that time is of the essence usually is

4. Hogue v. Wurdack, Mo.App., 298 S.W.2d 492, 495(2); Kolb v. Golden Rule Baking Co., 222 Mo.App. 1068, 9 S.W.2d 840, 842(1); Ebbs v. Neff, 220 Mo.App. 1070, 282 S.W. 74, 77(4); Bent v. Alexander, 15 Mo.App. 181, 190(1).

5. Veatch v. Black, supra, 250 S.W.2d loc. cit. 507; Katz Drug Co. v. Kansas City Power & Light Co., Mo.App., 303 S.W.2d 672, 680(7); Truck Leasing Corp. v. Esquire Laundry & Dry Cleaning Co., Mo.App., 252 S.W.2d 108, 111(2); Stephenson v. Morrissey, 241 Mo.App. 43, 230 S.W.2d 124, 127; Rickey v. New York Life Ins. Co., 229 Mo.App. 1226,

6. Gabel-Lockhart Co. v. Gabel, 360 Mo. 518, 229 S.W.2d 539, 543(3); Industrial Bank & Trust Co. v. Hesselberg, Mo., 195 S.W.2d 470, 476(19); Jackson County Light, Heat & Power Co. v. City of Independence, 188 Mo.App. 157, 175 S.W. 86, 90(6).

7. Page on Contracts (2nd Ed.), Vol. 4, § 2103, p. 3656; Williston on Contracts (Rev.Ed.), Vol. 3, § 846, p. 2371; Richards v. Combest, Tex.Civ.App., 208 S.W. 2d 392, 407–408(23); Hayes Mfg. Corp. v. McCauley, 6 Cir., 140 F.2d 187, 189–190(2).

deemed to evidence such intention, nevertheless a statement to that effect is not controlling and conclusive where other portions of the same contract[8] or related instruments[9] demonstrate a contrary intent.

In the instant case, we could not find that the parties to the contract had purposed, by use of the clause "time being of the essence," to impose an absolute, rigid, unyielding requirement that in any event the entire chat pile must be removed by August 15, 1955, without willfully disregarding or deliberately nullifying (neither of which we should or will do) the remainder of paragraph IV, ten typewritten lines in length. But, if we soften the impact of the clause "time being of the essence" by treating it as nothing more than a superfluous by-product of the indulged propensity of an inept and careless draftsman to bandy about mellifluous language without thought or realization of its legal significance [Corbin on Contracts, Vol. 3, § 715, loc. cit. 805], we still have neither right nor reason to emasculate the contract by ignoring completely the requirement "that buyer shall remove all of said *chatts* from said real estate on or before August 15, 1955." Furthermore, the very language of the extension proviso[10] (upon which Tamko relies) indicates that the parties contemplated *"continued removals"* and *"continued removal operations"*

rather than an interminable period of possession and occupancy on a stand-by basis with relatively dormant, quiescent and inactive operations punctuated by occasional, sporadic and minimal removals; and, any concept of removals from the chat pile and processing of chat on a stand-by basis for an intermediable period likewise would seem to be negated, at least by implication, by other contractual provisions considered cumulatively. For example, paragraph V permitted the buyer to remove machinery from the seller's land *"at any time prior to August 15, 1955,"* with no provision for subsequent removal of such machinery; and, paragraph VIII stated the understanding of the parties *"that buyer intends to process the chatts above described"* —an intention translated into practice during the first four years of the ten-year term of the contract but not thereafter. Viewing the contract in its entirety, we are constrained to conclude that the parties contemplated, intended and contracted that the buyer of the chat pile would make a bona fide effort to remove it from the seller's land during the ten-year term of the contract.[11]

On Tamko's own evidence that its processing plant had not been operated for five years prior to trial, that a substantial portion of the equipment had been removed therefrom, and that its occasional and spo-

8. Rocky Mountain Gold Mines v. Gold, Silver & Tungsten, 104 Colo. 478, 93 P.2d 973; Phillis v. Gross, 32 S.D. 438, 143 N.W. 373; Williston on Contracts (Rev. Ed.), Vol. 3, § 852, loc. cit. 2388, footnote 8. See also Jones v. McKinney, 107 Colo. 215, 110 P.2d 258.

9. Leiter v. Handelsman, 125 Cal.App.2d 243, 270 P.2d 563, 567–568; Katemis v. Westerlind, 120 Cal.App.2d 537, 261 P.2d 553, 558. See also Bilandzija v. Shilts, 334 Mich. 421, 54 N.W.2d 705; Bogojavlensky v. Logan, 181 Pa.Super. 312, 124 A.2d 412, 415; Stockmen's Supply Co. v. Jenne, 72 Idaho 57, 237 P.2d 613, 617.

10. "* * * provided, however, that if on August 15, 1955, buyer shall not have removed all of the *chatts* from said prop-

erty and desires to *continue to remove chatts* therefrom after said date, he shall have the privilege of so doing upon payment to sellers of the sum of $150.00 cash in advance annually as rental on the real estate above described during the period in which said *continued removals* may be made. Said sum of $150.00 shall be payable on Aug. 15, 1955, and annually thereafter for each calendar year or fraction thereof during which *continued removal operations* may be conducted."

11. Contrast Haeffner v. A. P. Green Fire Brick Co., Mo., 76 S.W.2d 122, 126 (cited by Tamko), in which the court pointed out, loc. cit. 126(9), that there was "no requirement in the lease that mining operations be commenced within any fixed time nor that the land be mined continuously thereafter, or some like provision."

radic removals from the chat pile during such five-year period had averaged only about 200 tons per year (a snail's pace at which five centuries would be required for removal of the estimated remainder of 100,000 tons in the chat pile), we think the conclusion inescapable that there had been no serious, substantial or sustained effort to remove the chat pile; and, with the record utterly barren of any explanation or excuse for failure to satisfy the contractual requirement that the buyer make a bona fide effort to remove the chat pile during the ten-year term of the contract, we need not consider what might have excused failure of performance.

 This is *not* a case in which the buyer of personal property situate on the land of another, for which no specific contractual provision for removal has been made, may claim the benefit of and rely upon an implied license to enter upon the land and remove the property. Consult Thayer v. Halterman, Mo.App., 10 S.W.2d 663, 665(6); annotation 26 A.L.R.2d 1194. On the contrary, the parties in the instant case included in their written contract detailed provisions for removal of the chat pile; and, having failed to perform substantially its contractual obligation to make a bona fide effort to remove the chat pile within the ten-year term of the contract and having offered no explanation or excuse for such failure of performance, Tamko had no right to exercise an option

for extension of the contractual term to "continue" removal operations long since substantially discontinued.[12] We are mindful of the general principle, upon which Tamko leans heavily, that forfeitures are not favored at law and that equity abhors them;[13] but, as perspicacious counsel for Fenix appropriately points out, Tamko enjoyed the full ten-year term provided by the contract for removal of the chat pile and the instant case does not turn upon any question of forfeiture but rather upon Tamko's failure to perform substantially the condition upon which its right to exercise the option for extension depended, i. e., a bona fide effort to remove the chat pile from Fenix' land during the ten-year term.[14]

 On the issue as to whether Tamko's title to the chat remaining on Fenix' property after expiration of the ten-year term of the contract was defeasible, we perceive no difference in principle between the instant case and Coffman v. Seyfarth, Mo. App., 200 S.W.2d 594, where the buyers' title to timber cut on the seller's land was held to have been defeasible as to saw logs not removed from the land during the contractual term. True, the chat pile was sold as personal property and *standing* timber is real property,[15] but the Coffman case is not distinguishable on this basis, for the court there was dealing with *severed* timber which is personal property.[16] In the case at bar, we agree with the trial court

12. Phelps Stone & Supply Co. v. Norton, 227 Mo.App. 268, 52 S.W.2d 413, 414–415 (1); 58 C.J.S. Mines and Minerals § 172, p. 367. See, generally, Long v. Rogers, Mo.App., 185 S.W.2d 863, 865(3); Farmers & Merchants Bank of Eureka v. Boland, Mo.App., 175 S.W.2d 939, 947(9); Motor Port v. Freeman, Mo.App., 62 S.W.2d 479, 481(3).

13. Haeffner v. A. P. Green Fire Brick Co., supra, 76 S.W.2d loc. cit. 126; Tetley v. McElmurry, 201 Mo. 382, 394, 100 S.W. 37, 39; King v. Hartford Life & Annuity Ins. Co., 133 Mo.App. 612, 114 S.W. 63, 65(1); Watson v. Gross, 112 Mo. App. 615, 87 S.W. 104, 105(10).

14. Boron v. Smith, 380 Pa. 98, 110 A.2d 169, 172, 48 A.L.R.2d 1170; Stout v. North, 211 Mo.App. 245, 252, 242 S.W. 119, 122; Temple Lumber Co. v. Arnold, Tex.Civ.App., 14 S.W.2d 926, 929; 58 C.J.S. Mines and Minerals § 172, p. 367.

15. Cooley v. Kansas City, P. & G. R. Co., 149 Mo. 487, 493, 51 S.W. 101, 103; Morgan v. Pott, 124 Mo.App. 371, 377, 101 S.W. 717, 719(4); Potter v. Everett, 40 Mo.App. 152, 161.

16. Gibson v. St. Joseph Lead Co., 232 Mo. App. 234, 243–244, 102 S.W.2d 152, 158 (2); Yoakum v. Davis, 162 Mo.App. 253, 259, 144 S.W. 877, 879(6).

that Tamko's title to that portion of the chat pile not removed during the ten-year term of the contract was defeasible and has revested in the landowner, defendant Fenix.[17]

 There is no merit in Tamko's complaint predicated on the overruling of its after-trial "Motion To Take Additional Testimony," which was filed on November 4, 1957, *sixty days after judgment* was entered on September 5, 1957. Since the trial court was not authorized to set aside its judgment more than thirty days after entry thereof, for a ground or reason not stated in a timely motion for new trial,[18] it properly refused Tamko's motion "to open the judgment" (in necessary effect, to set aside the judgment) that the testimony of one E. P. Hatcher might be taken, because Tamko's timely motion for new trial made no reference either to newly-discovered evidence in general or to Hatcher in particular.[19] In fact, the "Motion to Take Additional Testimony" might have been treated as a nullity and stricken from the files. Cf. Hoppe, Inc. v. St. Louis Public Service Co., 361 Mo. 402, 235 S.W.2d 347, 349(5), 23 A.L.R.2d 846. But, *even if* there had been a timely request for a new trial on the ground of the newly-discovered evidence set forth in Hatcher's affidavit, it should have been overruled anyway because the tendered testimony was of such character that it would not have produced a different result.[20]

After careful consideration of the excellent briefs and incisive analyses of able counsel for both parties, we are convinced that the judgment and decree of the trial court should be affirmed. It is so ordered.

McDOWELL and RUARK, JJ., concur.

## On Motions for Rehearing or to Transfer

STONE, Presiding Judge.

 The burden of Tamko's earnest motion for rehearing is that, if our construction of the contract (not now seriously disputed although not expressly accepted by Tamko) be correct, nevertheless "justice would have been better served by allowing (Tamko) a reasonable time to remove its property and awarding (Fenix) damages for withholding his property" and the result of affirmation of the decree nisi "is so highly inequitable that it does great violence to the rules of equity commonly applied." In short, Tamko argues the "real and practical injustice" alleged to follow our decision and casts its appeal upon "broad issues of justice" to which it is suggested our "legal semantics have blinded" us.

Passing the provocative question as to whether the scales have fallen from our

17. In this connection, see particularly Grant v. Haymes, 164 Ga. 371, 138 S. E. 892, where it was held that a grantor's reserved title as to *sand* was defeasible upon his failure to remove it within a reasonable time, there being no specified period for removal. And, consult also Hanna v. Buford, 191 Mo.App. 654, 177 S.W. 662; Id., Mo.App., 194 S.W. 1060.

18. Sec. 510.370 RSMo 1949, V.A.M.S.; Supreme Court Rule 3.25, 42 V.A.M.S.; Loveless v. Locke Distributing Co., Mo., 313 S.W.2d 24, 27(1); Ridenour v. Duncan, Mo., 246 S.W.2d 765, 766–767(1); Birmingham v. Kansas City Public Service Co., 361 Mo. 458, 235 S.W.2d 322, 324(1); Goodman v. Allen Cab Co., 360 Mo. 1094, 232 S.W.2d 535, 539(7); Rozell v. Rozell, Mo.App., 229 S.W.2d 700.

19. See particularly Overlander v. Withers, Mo.App., 148 S.W.2d 88, 93(5), and Deichmann v. Aronoff, Mo.App., 296 S. W.2d 171, 180(9). Consult also Powers v. Johnson, Mo., 302 S.W.2d 899, 901(2).

20. Terry v. Greer, 55 Mo.App. 507, 511 (2); Galeener v. Derris, Mo.App., 20 S. W.2d 167, 169(2); Fischman v. Schultz, Mo.App., 55 S.W.2d 313, 319(9); Smith v. Smith, Mo.App., 267 S.W.2d 704, 706 (4). And, see Lynch v. Baldwin, Mo., 117 S.W.2d 273, 276(9); Deacon v. City of Ladue, Mo.App., 294 S.W.2d 616, 626(15); Browhaw v. Dowd, Mo.App., 187 S.W.2d 29, 30(1).

eyes, we note carefully certain facts and principles which zealous counsel may have overlooked for the moment. This is *not* an action to reform the contract. In fact, it has *not* even been suggested that the contract was entered into by reason of a mistake or misunderstanding as to its subject-matter or any of its terms, provisions or language. On the contrary, neither Tamko nor Fenix in any wise attacked or impugned the contract in the trial court, but each clearly affirmed and confidently rested on the contract as executed, with each boldly asserting that it was subject only to the construction or interpretation which that party placed upon it. In that posture, Tamko sought an injunction, frequently characterized as "the strong arm of equity" and as a summary, transcendent and extraordinary remedy, not to be invoked as a matter of course but to be exercised sparingly and only in clear cases. Barnhart v. Ripka, Mo.App., 297 S.W.2d 787, 792 (10), and cases there collected. With Fenix' counterclaim doing no more than seeking a declaration of the rights of the parties under the contract, the primary and determinative issue became (and still is) one of construction of the contract. We observe parenthetically that, in the resolution of that issue, the transcript affords but scant evidentiary aid and, in the final analysis, we are remitted to the contract itself. None of the facts and circumstances attending execution of the contract were shown in evidence, and neither Tamko nor Fenix produced, or offered any explana-

tion for failure to produce, any individual who had participated in negotiation, preparation or execution of the contract. After objection had been sustained to an inquiry as to "what was the reason that * Tamko * * purchased the property," no offer of proof on this subject was made; and, as we have emphasized, the record is utterly barren of any explanation or attempt to explain Tamko's action or (as it may be more properly characterized) inaction under the contract.

 Upon reconsideration, we are satisfied that our construction of the contract is sound and correct. That, as its counsel argue, Tamko "could only be guilty of an innocent misinterpretation" of the contract would provide no foundation for the injunction prayed by Tamko; and, in the absence of any proof of fraud, concealment, misrepresentation, undue influence, violation of confidence or other inequitable conduct, such unilateral mistake by Tamko as to the construction or legal effect of the contract would afford no basis for other equitable relief, *even if* such other relief were sought by Tamko.[21] Many courts have found it appropriate to point out, in a wide variety of situations, that equity vests in the judiciary no broad and unfettered discretion to disturb or alter contractual rights and no carte blanche authority to decree such contractual construction as a court may believe would have been better for the parties;[22] that the aid of a court of equity may not be invoked

21. 19 Am.Jur., Equity, § 67, p. 84; Pomeroy's Equity Jurisprudence (4th Ed.), Vol. 2, § 843, p. 1718; Lamson v. Horton-Holden Hotel Co., 193 Iowa 355, 185 N.W. 472, 474–475, 26 A.L.R. 465; Cochran v. Pew, 159 Pa. 184, 185, 28 A. 219, 220; Sibert v. McAvoy, 15 Ill. 106, 109–110; Gall v. Union Nat. Bank of Little Rock, 203 Ark. 1000, 159 S.W.2d 757, 763. See also Williston on Contracts (Rev.Ed.), Vol. 5, § 1577, loc. cit. 4408–4409; 12 Am.Jur., Contracts, § 136, p. 628; Story's Equity Jurisprudence (14th Ed.), Vol. 1, § 189, loc. cit. 188–189.

22. Chicago Title & Trust Co. v. Robin, 361 Ill. 261, 198 N.E. 4, 7; Tudor v. Firebaugh, 303 Ill.App. 452, 25 N.E.2d 576, 581; Union Guardian Trust Co. v. Building Securities Corp., 280 Mich. 144, 273 N.W. 424, 429(10). Consult also Cleveland Trust Co. v. Capitol Theater Co., 117 W.Va. 1, 183 S.E. 457, 459(3), 103 A.L.R. 1435; Cosmopolitan Hotel v. Colorado Nat. Bank of Denver, 96 Colo. 62, 40 P.2d 245, 249(4), 96 A.L.R. 1446; Unger v. Newlin Haines Co., 94 N.J.Eq. 458, 120 A. 331, 336; Merchants' Loan & Trust Co. v. Chicago Rys. Co., 7 Cir., 158 F. 923, 927; Nelson v. Amling, 319 Ill.App. 571, 49 N.E.2d 868, 874.

to avoid or prevent enforcement of a contract, simply because such enforcement may work a hardship upon one of the parties;[23] and that, in the absence of some recognized ground warranting equitable interference, the rights of the parties should be determined by their contract and, as thus determined, should be respected and effectuated. Cleveland Trust Co. v. Capitol Theater Co., 117 W.Va. 1, 183 S.E. 457, 459(3), 103 A.L.R. 1435; Morrison-Knudsen Co. v. Phoenix Ins. Co. of Hartford, 8 Cir., 172 F.2d 124, 128. So, in the case at bar, the function of the trial chancellor in the first instance was, and of this court on appeal is, not to fashion under the guise of construction a new contract for Tamko and Fenix, but rather to interpret and enforce, without regard to its wisdom or folly, the contract which Tamko's assignor and Fenix' grantor voluntarily entered into.[24]

■■■ With respect to our construction of the contract, Tamko's only present complaint is that we have "overlooked the practical construction of the contract placed thereon by the parties." But, we find no evidence that Fenix said or did anything from which *any* "practical construction of the contract" on his part might be inferred or found. Contrast State ex inf. McKittrick ex rel. City of Springfield v. Springfield City Water Co., 345 Mo. 6, 22, 131 S.W.2d 525, 533(11). Certainly,

we cannot charge Fenix (as Tamko would have us do) with knowledge and acceptance of Tamko's construction of the contract simply because Tamko had erected a fence around the chat pile at some time not fixed in the record or on the theory that Fenix should have assumed that Tamko would not have intended to abandon the remainder of the chat pile and the old plant whose fluctuating market value was not shown as of any date during the period from Fenix' purchase of the land in May 1951 to expiration of the initial ten-year term of the contract in August 1955. To construe and enforce a contract in accordance with its practical construction by the parties, a court must be able to find that the minds of the parties met upon that construction [Andrews v. St. Louis Joint Stock Land Bank, 8 Cir., 107 F.2d 462, 468(16), certiorari denied Cantley v. Andrews, 309 U.S. 667, 60 S.Ct. 592, 84 L.Ed. 1014, rehearing denied 309 U.S. 697, 60 S.Ct. 711, 84 L.Ed. 1036] or, in other words, that both parties concurred in that construction. Corbin on Contracts, Vol. 3, § 558, loc. cit. 144. Being unable so to find in the instant case, we cannot confine the obligations of the contract under consideration within the limits of what one party, i. e., Tamko, understood it to mean.[25]

We perceive no similarity or analogy between the case at bar and Buchanan v. Louisiana Purchase Exposition Co., 245 Mo.

23. Dorsett v. Dorsett, 232 Mo.App. 126, 136, 90 S.W.2d 188, 194; Manufacturers' Finance Co. v. McKey, 294 U.S. 442, 448–449, 451, 55 S.Ct. 444, 79 L.Ed. 982, 986, 987; Coffin v. Younker, 196 Iowa 1021, 195 N.W. 591, 593(5); Cox v. Freeman, 204 Okl. 138, 227 P.2d 670, 678(5), 28 A.L.R.2d 1230, 1240(5); Union Central Life Ins. Co. v. Audet, 94 Mont. 79, 21 P.2d 53, 55(3), 92 A.L.R. 571; Crabill v. Montgomery Ward & Co., Ohio App., 136 N.E.2d 332, 335; Standard Lumber Co. v. Deer Park Lumber Co., 104 Wash. 84, 175 P. 578, 581(2), modified on other grounds 176 P. 332; Mizrahi v. Cohen, 1 Misc.2d 174, 146 N.Y.S.2d 605, 606(2); In re Ruszkiewicz' Estate, Sur., 41 N.Y. S.2d 437, 441(8), affirmed 266 App.Div. 709, 41 N.Y.S.2d 568; 19 Am.Jur.,

Equity, § 30, p. 57; Ibid., § 157, p. 148; 30 C.J.S. Equity § 62, loc. cit. 411.

24. Tant v. Gee, 348 Mo. 633, 639, 154 S. W.2d 745, 748; Renner v. Huntington-Hawthorne Oil & Gas Co., 39 Cal.2d 93, 244 P.2d 895, 900(7); Hill v. General Petroleum Corp., 128 Cal.App. 284, 294, 16 P.2d 1035, 1039(7).

25. Ryley-Wilson Grocer Co. v. Seymour Canning Co., 129 Mo.App. 325, 331–332, 108 S.W. 628, 630(3); Dakan v. Union Mut. Life Ins. Co., 125 Mo.App. 451, 459–460, 102 S.W. 634, 636(5). See also Dutton v. Prudential Ins. Co. of America, 238 Mo.App. 1058, 1072, 193 S.W.2d 938, 945.

337, 149 S.W. 26, with which Tamko charges that we are in conflict. As for the alleged conflict with Richmond Land Co. v. Watson, 129 Mo.App. 554, 107 S.W. 1045, the holding in that case is quickly distinguishable from our decision in the instant case and from Coffman v. Seyfarth, Mo. App., 200 S.W.2d 594, in that the railroad ties sought to be removed in the Richmond case were not regarded as "timber" (the term employed in the reservation there involved) but were treated as "articles manufactured out of the timber." Compare Hubbard v. Burton, 75 Mo. 65.

Compassion, charity and forbearance are Christian virtues and personal attributes with which not even a court of equity can endow an individual; and, sympathetically attuned as our ear may be to Tamko's cry ad misericordiam, we find no basis on which the prayer of its appeal properly may be granted. Let Tamko's motions for rehearing or to transfer stand overruled.

McDOWELL, J., concurs.

RUARK, J., dubitante.